**David Lee HARRIS, by His Next Friend, Wesley E. Harris and Wesley E. Harris and Aileen Harris, Plaintiffs-Respondents,**

**v.**

**Eugene L. BALES, M.D., Defendant-Appellant.**

**No. 25215.**

Kansas City Court of Appeals, Missouri.

June 1, 1970.

Motion for Rehearing or Transfer to Supreme Court Denied Oct. 5, 1970.

Application to Transfer Denied Dec. 14, 1970.

A. V. McCalley, Richmond, Robert S. McKenzie, McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, for defendant-appellant.

James J. Wheeler, Keytesville, Dick B. Dale, Richmond, David Collins, Collins & Grimm, Macon, for plaintiffs-respondents.

MAUGHMER, Commissioner.

This case came to the writer on reassignment. It is a suit, in two counts, to recover damages from Dr. Eugene L. Bales, M. D., for alleged malpractice. In count one, David Lee Harris, a minor, by his father as next friend, is the plaintiff. The plaintiffs under count two are the parents of the minor son. The verdict and judgment were for the plaintiffs in the amount of $5,000.00 under each count. The defendant has appealed.

On June 17, 1965, the plaintiff David Lee Harris, then twelve years of age, resided with his parents just south of Bosworth in Carroll County, Missouri. His father, Wesley E. Harris, was employed by the county as a "road overseer". On this date David was playing with his younger brother on their front porch. David was about to jump from the porch to a rocky flower bed some five feet below, when he was suddenly pushed by his younger brother and fell to the flower bed. As a result of the fall he sustained a fracture of his right leg about one-third of the way up from the knee. David was taken in an ambulance to the Carroll County Memorial Hospital at Carrollton, where he was placed under the care of the defendant.

The defendant, Dr. Eugene L. Bales, at the time was a physician and surgeon, conducting a general practice with offices in Carrollton. He was a graduate of the University of Kansas and had practiced continuously since his graduation in 1933. Dr. Bales had X-rays taken of David's right leg. With the pictures as an aid, he diagnosed the injury as a transverse fracture of the right femur. He stated further that the fracture was "pathological", that there was a "bone tumor" in the area of the break, which he thought was probably a malignant bone cancer. Mrs. Harris said Dr. Bales told her, "Your boy has got cancer—it will be fatal and soon." The boy's leg was placed in traction from June 17th until June 22nd, but this did not result in a reduction of the fracture, as had been hoped. So, on June 22, 1965, the defendant, assisted by Dr. E. Warren Allen, M. D., operated. They did what was termed an "open reduction". Dr. Jack L. Vinyard, anesthetist, an X-ray technician and nurses were also in attendance. X-rays were taken during the operation.

As performed, the operation involved cutting into the overlying soft tissues to expose the two lengths of fractured bone, and then fastening them together by a metal "Rush" pin inserted lengthwise through the marrow portions of the bone. An attempt was made to insert a second metal pin but this effort was abandoned because of the claimed softness of the bone in the fracture area. The leg was placed in a short, temporary cast "so they could watch for the extension of any malignancy."

An X-ray picture taken at the conclusion of the operation showed that the two bone pieces were not straight but were left at an angle to each other. Defendant admitted in his deposition that these bone segments were left at an angle of "seventeen degrees approximately". X-rays and examination at Mercy Hospital on July 9, 1965, showed the angulation to be about 25 degrees with a rotational misalignment of 20 degrees. During the operation by the defendant, bone samples were taken and sent to the pathology department at St. Luke's Hospital in Kansas City for evaluation. The pathologist there on June 24, 1965, reported to Dr. Bales that "no abnormality was noted."

David remained in the Carroll County Hospital until June 28th, when he was taken home. During his hospitalization David received blood, oxygen and glucose administrations. His mother described his appearance on his return from the operating room as white, cold and "looked like a piece of marble and showed no signs of life." During the week following the operation she said he was in constant pain, was nervous, scared, and did not eat. After leaving the hospital he complained of pain and said his leg burned. Mrs. Harris said she called the defendant every day and informed him of the boy's condition. She said defendant's only response was "keep him quiet." Shortly before July 6th a yellow, greenish substance which Mrs. Harris said smelled like something rotten, began to seep out through David's cast. At night a fan was set up in an effort to blow the odor out of the house. On July 6th the boy's mother again took him to defendant's office. Dr. Bales thereupon X-rayed David's skull, leg, chest, ribs and lungs in a further search for cancer. He offered no suggestions as to treatment which might have cleared up the infection. He simply told her to take the boy home and "keep him quiet". Shortly thereafter Mrs. Harris went to Brunswick, Missouri, to consult Dr. John Lewis Fetzer, D. O., her regular doctor. Dr. Fetzer looked at David, who was in the rear seat of the Harris automobile, and advised that he be taken to Children's Mercy Hospital in Kansas City, Missouri.

David was admitted to Mercy Hospital on July 9, 1965. The records of that institution were received in evidence and show in part: Upon admission he was found to be in a poorly-constructed long leg cast which was too short, which cast was broken at the ankle. These hospital records were signed by Dr. Charles E. Shopfner, radiologist, Dr. John Morse, resident surgeon, and Dr. David Francisco, orthopedic surgeon. We quote therefrom:

"On the A–P view the fracture was angulated 25° in valgus with a one inch ro-

tational deformity at the fracture site. * * *

"The impression on admission was healing fracture of the right femur fracture, with angular and rotational deformity (maluniting). On 7/12/65, after three days of traction on the skin under 10 pounds, it was seen that there was no correction of the angular or rotational deformity of the femur. It was then elected, after consultation with Dr. Francisco, that the Rush pin should be removed and a Steinman pin inserted, use closed manipulation of the distal femoral fragment and place the boy in a one and one half spica. This was done on 7/14/65 with the postoperative film showing almost complete restoration of the normal architecture of the distal femur, with only a residual of approximately 5° angular deformity at the fracture site. * * *"

No reference was made at Mercy Hospital to the possibility of any bone lesion, tumor or cancer, nor did the radiologist or any other doctor treating him at Mercy, note any such condition in the X-rays. The trial of this case commenced more than 16 months after the injury and David had not developed cancer.

The first objective at Mercy Hospital was to clean up the infection. This was quickly accomplished, the leg was then placed in traction for five days in an effort by that method to correct the angular and rotational deformity. However, the effort was unsuccessful and on July 14, 1965, as heretofore described, David was again operated. This operation was performed by Dr. John Morse, M. D., who was assisted by Dr. David Francisco.

After the operation the leg was placed in a Spica cast. David left the hospital on July 16th, two days after the operation although from time to time he returned for observation and once for removal of the Steinman pin. His recovery from this second operation might be described as "good". He was bedfast for about one

month, and then moved about in a wheel chair. The cast was removed in December and after that he used crutches. He returned to school early in 1966 and by summer got around almost normally except that he limped when he became tired.

Bills for medical care totalling $1,145.50 were received in evidence without objection. Defendant never submitted a bill. The evidence as to the chronological occurrences which we have summarized, was supplied by the testimony of David, his parents and the hospital medical records. The only other witnesses for plaintiffs were Mary Garwood, custodian of the Mercy Hospital records, and Dr. Fetzer, D. O., whose testimony will now be considered.

Dr. John Lewis Fetzer, D. O., is a graduate of the College of Osteopathy, Kirksville, Missouri, and carries on a general practice at Brunswick, Missouri. He stated that he was familiar with the standard of care which is ordinarily exercised by the medical doctors in the community of Carrollton, Missouri, and in like communities, with reference to the treatment and repair of broken bones. He was asked a hypothetical question, in which the facts as we have portrayed them, were assumed, including the assumption that after the operation "the resulting angulation was seventeen degrees with a twenty degree deformity in rotation." Responding, Dr. Fetzer expressed his opinion that the operating physician (the defendant) in setting the fracture, failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of the medical profession in good standing, practicing in Carrollton or in similar communities. A second hypothetical question was propounded where the angulation assumed was *twenty-five* degrees (instead of 17 degrees). His answer was, of course, the same as to the previous question.

Besides testifying himself, the defendant called as witnesses five other doctors, and Jack Tindle, Administrator of the Carroll County Hospital. Mr. Tindle identified the Carroll Hospital records covering the hospitalization of David Harris, which in part, stated: Dr. Eugene L. Bales, M. D., was the physician. The diagnosis on 7–2–65 was, "sarcoma of the femur, pathologic fracture, * * * Biopsy of bone, lower end of femur, two inches above condyle: tumor appears to be five centimeters in length and involves one-half diameter of bone." A report from Dr. F. C. Helwig, M. D., pathologist, St. Luke's Hospital, Kansas City, where the bone specimens were sent for analysis, reads: "A rare hypertrophied and hyperchromic nucleus is seen but it is certainly not enough atypicality in this material to suggest the possibility of bone sarcoma * * *. There is no abnormality noted." The St. Luke's biopsy diagnosis signed by Dr. D. M. Gibson, M. D., was "non-ossifying febroma from the femur".

Dr. E. Warren Allen, M. D., a graduate of Tulane University, has practiced in Carrollton since 1948 except for a period of military service. The defendant asked him to look at David Lee Harris and examine the X-rays. Dr. Allen thought the fracture should be united with a "Rush" pin, and a piece of bone should be taken for examination to determine what kind of tumor was present. He said he assisted the defendant in the operation, that they put one "Rush" pin in and attempted to insert a second one but the bone "was just like a piece of tissue paper", so we were unable to put the second pin across the fracture site. Dr. Allen said that "if there was any angulation, it was not visible to the naked eye; * * * we * * * did make final films after surgery to make sure it was all right". However, the defendant in his deposition, admitted there was angulation after his operation on 6–22–65. As to the amount, his specific answer was, "Maybe, 17 degrees, approximately." It was Dr. Allen's opinion that Dr. Bales in the David Harris matter, had exercised the ordinary and reasonable skill of a physician

practicing in the Carroll County community.

Dr. L. E. Riller, M. D., a graduate of the University of Kansas has practiced since 1937. He has specialized in orthopedic surgery and has had a long acquaintance with the defendant. He examined X-rays of David Harris taken on June 17, 1965, which he said showed the broken right femur and a "peculiar looking area" that looked like a bone tumor. He said X-rays after the operation on June 22, 1965, showed a fracture well reduced and no angulation from a side view. He said the X-rays of July 6, 1965 showed the pin was still in place, "a tiny bit of angulation" and the alignment "was acceptable". His reading of plates taken July 12, 1965 was that there had been a "considerable slip". He further stated that "it is not a good reduction, but not a real bad one either." On cross-examination, and with respect to the July X-rays, the doctor admitted there was angulation but said he would have to measure to say whether it was fifteen or twenty-five degrees. He said the leg was crooked, but in a twelve year old boy it might straighten out later, but it usually heals the way it is set.

Dr. David Francisco, a graduate of the University of Kansas, is an orthopedic surgeon and on the staff at Children's Mercy Hospital, Kansas City, Missouri. Dr. Francisco and Dr. John Morse, examined the X-rays taken on July 6th and 12th, and diagnosed David's condition as a healing fracture of the thigh bone, with some angulation and rotation present. He recommended "that we go ahead and remove that pin and insert another type pin called a Steinman pin, and manipulate the fracture, because I simply felt that while this wasn't what you would call a bad position, it was —I felt that we could do better with a rather minor procedure and went ahead and proceeded to do this." When asked if David had a "crooked leg" when he came to Mercy Hospital, Dr. Francisco said: "Some deformity and some angulation of bone will be covered up by the muscles, but

it was my opinion that there was enough deformity present that when—that it would be better with some treatment." Dr. Francisco said the second operation when the "Rush" pin was removed, the fracture reduced manually and Steinman pins used, was successful, leaving only a slight angulation and with no infection. No cancer was found or suspected. He said the findings of Dr. Helwig from St. Luke's ruled out cancer "about as positive as you can get". Dr. Francisco, like Dr. Riller, found little angulation in the side view pictures taken after the Carroll operation, but both agreed that not only side, but front and back, and sometimes oblique, views were necessary to show the amount of angulation. Dr. Francisco said that Dr. Shopfner, the Mercy Hospital radiologist, was competent, and that neither he nor Dr. Shopfner found anything indicating cancer or tumor. He said that in his opinion David would have had "some deformity" for life if they hadn't done something for him.

Dr. Jack L. Vinyard, M. D., practices at Carrollton, Missouri. He administered the anesthetic when the defendant operated on David at the Carroll County Hospital. He said the operation lasted two hours and seventeen minutes. He stated that the pieces of bone were removed easily.

Dr. M. G. Gonzales, M. D., resides in Warrensburg, Missouri, and specializes in radiology. Dr. Gonzales is a graduate of Neuvo Leon University, in Monterey, Mexico. He read the June X-rays as showing a bone lesion. He said only examination by a pathologist would show whether it was malignant or not. He said that Dr. Shopfner, the radiologist at Mercy Hospital, "missed this lesion"; that the June X-rays and even those of July 9th showed little or no angulation.

The defendant himself testified. He is a graduate of the University of Kansas, and has been a general practitioner since 1933. He said he practices all types of surgery including orthopedic surgery. He first

saw David Lee Harris at the Carroll County Hospital on June 17, 1965. He examined the boy and the X-rays. He found a fracture at the distal end of the femur. He testified that his examination of the X-rays showed "an uneven ragged edge area of bone, porosis, or lack of bone, in an area which appeared elongated several inches and perhaps, maybe two-thirds or three-fourths of an inch in cross-section that was quite irregular in its density and unusual to the rest of the bone * * *." In describing the operation, undertaken after consultation with Dr. Riller and Dr. Allen, he said the bone was diseased so badly they could use only one pin instead of two as had been planned; that a short cast was used so they could "observe any extension of malignancy." He said he removed pieces of bone for a biopsy; that the mother wanted to take the boy home and he finally agreed, but directed her to report every day which he claimed she did not do. He said he was highly suspicious of malignancy even after the report from Dr. Helwig; that Mrs. Harris "pumped it out of him" that he thought the boy might have cancer. He expressed the belief that "what Mercy Hospital did was unnecessary." As to what would be the "outside limit of acceptable angulation", he stated that "some authorities" say 25 degrees, but that he "would at this time" go along with 20 degrees. He admitted that in his deposition he stated that there was a 17 degree angulation when he finished his operation, but at the trial changed to 7½° although he had read over and signed the deposition. He never divulged to Mrs. Harris the contents of the favorable reports from St. Luke's Hospital relative to his suspicions of cancer and he never submitted a bill for his services.

Defendant's main point on appeal is that plaintiff did not make a submissible case for three reasons:

1. At most the evidence shows only a bad result and does not show negligence.

2. Expert medical testimony is required to make a submissible case and Dr. Fetzer, plaintiff's expert, being an osteopath, was not qualified.

■ 3. There was only an honest difference of opinion as to whether defendant properly treated the plaintiff, and defendant was entitled to a "wide range in the exercise of his judgment." We hold that Dr. John Lewis Fetzer, Osteopath, was qualified to testify as an expert in the case. He resided and practiced in the same area and community as the defendant. He was familiar with the procedure followed by both M. D.s and D. O.s in reducing bone fractures. He was testifying as to matters of diagnosis and treatment known to every physician and practitioner of every school in the area. Defendant cites Mann v. Grim-Smith Hospital and Clinic, 347 Mo. 348, 147 S.W.2d 606, in support of his contention that Dr. Fetzer's testimony was not admissible as an expert. We quote from that opinion at page 608, which we regard as against defendant's contention:

"* * * In the Cazzell [Cazzell v. Schofield, 319 Mo. 1169, 8 S.W.2d 580] case (where an osteopath testified in a case against an M. D.), we reaffirmed the ruling of the Still [Grainger v. Still, 187 Mo. 197, 85 S.W. 1114] case (where M. D.s were allowed to testify against an osteopath) that such a witness was 'competent to express an opinion as to matters of diagnosis and to testify to any scientific fact that is, or ought to be, known to every physician and surgeon of every school or system.' * * *"

Subpoints 1 and 3 of defendant's main point on appeal may be considered together. In Williams v. Chamberlain, Mo., 316 S.W.2d 505, 510, 511, the plaintiff alleged malpractice when tetanus developed after a one-inch cut on plaintiff's head had been treated by the defendant physician. The opinion declares generally and in some de-

tail, the skill which the law requires of a physician in various situations. We quote:

"While the rule has been stated with slight variations from time to time, it may properly be said that a physician is required to use and exercise that degree of care and skill used and exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances. * * * Since the physician everywhere is required to exercise not only reasonable 'care,' but also the 'skill' which he possesses (giving authorities), we have no quarrel with the inclusion of the element of 'similar localities' in the definitive requirement and probably it is properly included. So long as the physician properly exercises his skill and the requisite degree of care, he is not liable for an honest error of judgment. (Citing cases.) Nor, having so acted, is he liable merely because of a bad result. (Citing cases.) It was stated by Judge Taft (later Chief Justice) in the case of Ewing v. Goode, C.C.S.D. Ohio, 78 F. 442, 443, that if a failure to cure or a bad result were held to the evidence of negligence, then, ' * * * few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the "ills that flesh is heir to." ' The burden is upon a plaintiff to prove negligence. * * * And a plaintiff's burden embraces not only proof of negligence but proof also that the negligent act or acts caused the injury. Pedigo v. Roseberry, 340 Mo. 724, 102 S.W.2d 600; Nevinger v. Haun, 197 Mo.App. 416, 196 S.W. 39. Generally. the doctrine of res ipsa loquitur is not applicable in malpractice cases. (Citing cases.) * * * In at least the great majority of malpractice cases a submissible case may only be made by expert medical testimony for otherwise a jury may not know (or guess) whether the defendant's acts did or did not conform to the required standards. Pedigo v. Roseberry, 340 Mo.

724, 102 S.W.2d 600; McDonald v. Crider, Mo.App., 272 S.W. 980; Hopkins v. United States, D.C.W.D.Mo., 152 F. Supp. 473. In the case last cited the court said in part, loc. cit. 476, 477: 'A plaintiff in a malpractice action assumes a very heavy burden where the basis of recovery is predicated on an attack on the technique and skill exercised by an operating surgeon or on a charge that he failed to exercise reasonable judgment. In the absence of most unusual circumstances it is a burden that cannot be discharged in normal course by lay testimony. * * * The cases where a physician or surgeon has left foreign objects in operative cavities fall into an entirely different class. * * * There, proof of such fact alone is generally held to establish a prima facie case of negligence, and the defendant is put upon his proof, although negligence is still the ultimate test. Hilton v. Mudd, Mo.App., 174 S.W.2d 31.' "

The plaintiff's submission in the case before us was that the defendant "failed to set plaintiffs * * * broken leg in proper position and alignment", that defendant was thereby negligent and as a direct result plaintiff sustained damages. Negligence was defined as "The failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by the members of defendant's profession in good standing, practicing in similar localities". In addition to the Williams case, supra, defendant invites our attention to Hart, et al. v. Steele, Mo., 416 S.W.2d 927, where plaintiff charged that defendant negligently punctured plaintiff's kidney in the course of a hysterectomy, and where there was no expert medical evidence for plaintiff and the only doctors who testified said the kidney developed a fistula and was not cut during the operation, it was held defendant was entitled to a directed verdict. The opinion recites the general rules as to the skill required of a

physician as the same is set forth in our quotation from the Williams case, supra.

Rauschelbach, et al. v. Benincasa, et al., Mo., 372 S.W.2d 120, is a case where the defendant, the anesthetist, administered the anesthetic by endotracheal intubation, that is, by inserting a tube between the vocal cords, during a hysterectomy. Plaintiff claimed injury to her vocal cords. There was no expert medical testimony and plaintiff's case was ruled to be nonsubmissible. The opinion generally makes these declarations: The burden rests upon plaintiff to prove failure to meet required standards of care; negligence in some cases (examples, foreign object left in patient's body or injury to an organ far removed from operation site) may be proved by circumstantial evidence, and in determining if a case for the jury was made, only the evidence most favorable to plaintiff may be considered.

The case of Haase v. Garfinkel, Mo., 418 S.W.2d 108, involved a heart patient. The defendant sent him home and did not prescribe anticoagulant drugs. Shortly thereafter the patient died. It was held no submissible case had been made, and the doctor, being vested with wide range in the exercise of his judgment in deciding what treatment to use, could not be found guilty of negligence unless it was shown that the course he pursued was clearly contrary to any of those recognized by the medical profession. These cases do not, we believe, rule our case.

Where objects are left inside the patient after an operation, a recovery for malpractice is often allowed. The Supreme Court (Null v. Stewart, et al., 78 S.W.2d 75) affirmed a $10,000.00 judgment, where a piece of gauze was left in the abdominal cavity, injuring plaintiff's health and requiring further surgery. In the old case of West v. Martin, 31 Mo. 375, 378, 379, plaintiff charged malpractice in the unskillfulness with which defendant set plaintiff's broken leg. Defendant offered evidence that plaintiff and his family "had

weak bones, very liable and easy to break". The judgment for plaintiff was affirmed. The opinion carries this statement:

"Whether errors of judgment will or will not make a surgeon liable in a given case depends not merely upon the fact that he may be ordinarily skilful as such, but whether he has *treated the case skilfully or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession.* For there may be responsibility where there is no neglect, if the error of judgment be so gross as to be inconsistent with the use of that degree of skill that it is the duty of every surgeon to bring to the treatment of a case according to the standard indicated.    *    *    *" (Italics added.)

In Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 660, plaintiff contended that defendant physician had negligently set his broken leg. Defendant said he advised plaintiff to have an operation. This was disputed by plaintiff. Admittedly defendant treated the fracture by attaching weights in an effort to reduce it. The trial court directed a verdict for defendant. The Supreme Court reversed and said:

"*    *    * In the case before us the X-ray photograph of plaintiff's leg, taken before the operation by Dr. Kleinfelter at the hospital in St. Louis, disclosed a very unsatisfactory result. That, coupled with the defendant's admissions, and *the further fact that the operation in St. Louis was a success,* certainly made a case for a jury. The question of whether plaintiff refused to permit the defendant to perform an operation was, as stated above, a question for a jury." (Italics ours.)

The Springfield Court of Appeals (Chilton v. Ralls, 220 Mo.App. 355, 286 S.W. 718) affirmed a malpractice judgment for plaintiff. Defendant doctor had placed plaintiff's broken leg in a cast, the bone

did not align, and a knot appeared at the juncture. Defendant assured plaintiff the knot would go away. Finally plaintiff went elsewhere, the bones were scraped, the broken bone was reset in alignment and with no further pain or knotty growths. We quote briefly from that opinion:

> "We think the plaintiff's evidence was sufficient to take the case to the jury. Defendant's testimony was to the effect that the treatment of the leg was according to approved methods and done in a careful manner, but we cannot weigh testimony. The finding of the jury binds us on that question."

In Gilstrap v. Osteopathic Sanatorium Co., 224 Mo.App. 798, 24 S.W.2d 249, a tonsillectomy was being performed upon plaintiff in defendant sanatorium. There was evidence that the operation took four times as long as was reasonably required, that a hemorrhage was started, that the doctor did nothing to stop the hemorrhage for forty-five minutes, and the patient died from loss of blood. Judgment for the plaintiff was affirmed, the court holding, Syllabus 7:

> "Whether death of patient after tonsillectomy operation was due to negligent and improper treatment by defendant sanatorium company's staff physician *held* for jury, though there was no expert testimony on subject."

A quite similar result was reached by our Supreme Court in Eichholz v. Poe, et al., Mo., 217 S.W.2d 282. In that case the plaintiff had been operated for removal of a kidney. On the next day it was determined to extract one of his teeth. In doing so the patient suffered a broken jaw. The defendant physician did not reset the jaw or otherwise treat his mouth to stop the soreness and a discharge, which lasted until he secured another physician. It was held that this evidence was sufficient to present a jury question and the action of the trial judge in directing a verdict for

defendant was reversed and the cause remanded for a new trial.

We mention the case of Farrell, et al. v. Lavine, 37 Misc.2d 497, 236 N.Y.S.2d 323, a malpractice action. There the plaintiff, a three year old boy, fell in his own back yard and sustained a fracture of the left femur. Defendant placed the leg in a Spica cast. X-rays taken 10 days later revealed both substantial angulation and overriding. Defendant advised the boy's mother that the injury was healing properly and stated that he, the defendant, was satisfied with the condition. Five days later the child was taken to a hospital and an orthopedic surgeon did an open reduction of the fracture and the child made a good recovery. Plaintiffs' experts and the doctors at the second hospital found the X-rays ten days after the injury showed the position of the limbs to be unsatisfactory. The court said:

> "Keeping in mind that the plaintiffs are entitled to the benefit of every reasonable inference (Levine v. City of New York, 309 N.Y. 88, 92, 127 N.E.2d 825, 826), I am satisfied that there were issues of fact that required determination by the jury and, further, that the jury could well have properly concluded that the defendant was negligent and that such a finding is not contrary to the credible evidence nor was there a 'defect of proof' so as to permit the court to conclude, as a matter of law, that the plaintiffs were not entitled to recover."

In the Washington University Law Quarterly of February, 1962, at page 402, there is an article on Medical Malpractice in Missouri. The cases portraying the care required of doctors are reviewed, and to some extent, criticized. We wish to refer particularly to two conclusions expressed therein. One, when a patient comes to a physician for medical care, the doctor's functions, as a whole are, like Caesar's Gaul, divided into three parts. The first is the diagnosis, as to which the doctor has

wide latitude. Second, is the determination as to what treatment (or an operation) shall be utilized. Here again a wide range of selection rests with the doctor so long as the determination made is within a fair purview of accepted medical knowledge. Third is the *application* of the treatment determined upon, which may be drugs or an operation. As to this third phase, the doctor must exercise skill, knowledge and technique comparable in performance to that of his associates in similar communities in caring for similar injuries or illnesses. He must have knowledge and understanding of the medicines and drugs which he prescribes. If he operates he must perform with care, skill and a good technique. The latitude is more restricted in the *application* of the selected remedy, than in diagnosis and *selection* of treatment.

Second, the courts sometimes, as in the Eichholz case, supra, apply the doctrine of res ipsa loquitur without expressly denominating it as such. Judge Eager, in the Williams case, supra, in part at least, recognizes this situation when he says (316 S.W.2d page 511):

"Generally the doctrine of res ipsa loquitur is not applicable in malpractice cases."

We subscribe to both of these conclusions expressed in the annotation.

■ We are convinced, and we hold, that plaintiffs have made a submissible case. We believe the defendant did not, in the *application* of the treatment or remedy which he selected, use that degree of care, attention and skill, which is ordinarily exercised by physicians in similar communities in caring for and repairing similar injuries.

■ In the case before us there was no question as to the diagnosis. David Lee Harris, a twelve year old boy, had received a fractured right femur—a simple break of the one bone in his upper leg. He was promptly, by ambulance, taken to the Car-

roll County Hospital where defendant, with the aid of X-rays, examined him. It was then up to defendant to decide upon the method to be used in repairing and uniting the broken bone. A physician has broad latitude in determining the method. Traction and probably some manipulation were used for five days in attempting to reduce the fracture. Then defendant determined to open the flesh, expose the broken bone and set it, using "Rush" metal pins. The doctor would not be ruled guilty of malpractice because of the five days' delay, nor for using "Rush" pins instead of "Steinman" pins. He is, however, we think, chargeable with the duty and requirement to exercise skill, knowledge and ability in the *application* of the remedy or method he selected. The degree of skill must be commensurate with that possessed and commonly used by his medical associates in similar communities in like injuries. Did the defendant exercise that degree of skill?

Dr. Bales and Dr. Allen, his aid in the operation, said they inserted one metal "Rush" pin but the bone was "like tissue paper" and wouldn't hold. They planned to use a second Rush pin but said they could not because of the soft bone. They testified they saw a tumor and believed there was cancer in the bone. Samples of bone were sent to St. Luke's, but no indication of cancer was found. Defendant testified that the X-ray taken immediately after their operation showed good alignment, although this picture was only a lateral view. He thought they did a good job. But the evidence shows that the patient was in continuous pain, the leg burned, an infection developed which produced running and odorous pus. The boy was brought to defendant fourteen days after the operation for further examination. Again defendant X-rayed the leg. On his deposition he admitted a 17° angulation was present. He said the cast was broken at the ankle and apparently there had been some slipping. He observed the infection. What did he do? He took X-

rays of the chest, head, arms and other parts, seeking to confirm his diagnosis of cancer. He told the boy's mother to take him home and "keep him quiet." He neither did anything nor advised doing anything to get rid of the infection. He neither did nor suggested a second or further repair of the fracture, although he conceded that a 25° angulation meant a crippled leg. His actions or non-action on the occasion of this second examination made, we believe, a submissible case of malpractice. If there was any doubt at that time, it was clearly resolved against the defendant by the immediately-ensuing events at the Children's Mercy Hospital in Kansas City, Missouri.

Right after this unproductive second visit to the defendant, Mrs. Harris had her son examined by Dr. Fetzer, D.O., her usual physician. Dr. Fetzer advised her to take him to Children's Mercy Hospital in Kansas City, Missouri, and she did so. There the X-rays, lateral and anterior-posterior, revealed an approximately 25° angulation and 20° rotational misalignment. The doctors at Mercy, whom we have heretofore identified by name, and whose testimony we have summarized, first tried to repair the maladjustment by traction. This was not successful, so they cleaned up the infection, opened the wound, reset the broken bone, inserted a "Steinman" metal pin, and placed the leg in a cast. There was a good recovery, the leg is not observably crooked, and no cancer has ever developed. The Mercy Hospital doctors, as well as Dr. Fetzer, D.O., said the bone setting which they found, was not satisfactory or "acceptable", and that another operation was required.

Defendant says a doctor cannot be convicted of malpractice unless there be expert medical testimony against him. In addition to Dr. Fetzer, we regard the testimony of the Mercy Hospital doctors as expert testimony as to the poor, unsatisfactory and unacceptable job done by defendant. Moreover, we believe this is a case where a recovery might be allowed without expert medical testimony—as is done where gauze or an instrument is left inside the patient—where the patient's jaw is broken and nothing done, or where the patient bled to death from an unsutured wound during a tonsillectomy. A simple one-bone fracture is a rather common injury. Even laymen jurors know it is usually repaired by the ordinary practitioner without infection, and without having a crooked arm or leg. The defendant saw the infection, the poor alignment and the crooked leg. He did nothing about it except advising the mother to "keep him quiet." Shortly thereafter other doctors cleaned up the infection, reset the broken leg, got good alignment, and eliminated the crooked leg, which would have been crippling for life. The defendant said at one time that he had done a good repair job and the operation at Mercy was not necessary. Then he suggested that if his operation was less than successful it was because the patient had soft bones, which he thought were cancerous. Finally and without any excuse, he neither advised nor did anything at the time of his second examination, when the boy clearly required further medical attention, not only for a resetting of the bone, but for cleaning up the infection. We believe these facts alone are sufficient to present a jury question. Certainly, with the expert medical evidence from Dr. Fetzer and the Mercy Hospital doctors, a case for the jury was made.

Appellant says the trial court should have discharged the jury panel because plaintiffs' counsel "belabored the question of a juror's interest in insurance companies that write liability insurance for doctors * * *." Defendant did not object to any of these questions when they were propounded but asked the court to discharge the panel after the inquiries had been made and answered. We believe defendant should have objected when the questions were asked. Furthermore, we believe we should largely defer to the discretion of the trial judge. Rodenberg v. Nickels, Mo.App., 357 S.W.2d 551. We rule this point against appellant.

Appellant also charges that plaintiffs "presented their case on the theory that defendant was liable in damages" for the original injury. He says neither "the evidence, instructions or statements of counsel" properly limits the case. This assignment was first presented on the appeal to this court. Objections to evidence or to statements of opposing counsel or to any instruction, may not properly be raised and presented for the first time on an appeal to an appellate court. We do not consider this assignment further and we deny it.

Appellant says the verdict is excessive. Defendant offered no instruction on damages. The proved medical expenses were $1,145.50. Much nursing care furnished by the mother could be traceable to defendant's negligence. The boy was on crutches for months, the length of that could be traceable, in part, to the same negligence. The trial court refused to disturb the amount allowed under either count. Certainly the allowance for David is not excessive, nor shall we disturb the allowance under count 2. In Null v. Stewart, 78 S.W.2d 75, our Supreme Court in the depression year of 1934, approved a malpractice judgment of $10,000.00 for a 54 year old woman, who suffered pain and paralysis of the left side because gauze was left in her abdominal cavity, necessitating a second operation. The 1969–70 dollar is greatly inflated and has a tremendously reduced purchasing power compared to the 1934 dollar. We shall not hold the award under either count to be excessive.

The judgment is affirmed.

SPERRY, C., concurs.

PER CURIAM:

The foregoing opinion by MAUGHMER, C., is adopted as the opinion of the Court.

All concur.