David PORTIS, Respondent,

v.

James GREENHAW, M.D., Appellant,

Community Hospital Association, Inc., Defendant.

No. WD 58048.

Missouri Court of Appeals, Western District.

Jan. 9, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 27, 2001.

D. Bruce Keplinger, Overland Park, KS, for Appellant.

Robert E. Murphy, St. Joseph, MO, for Respondent.

Before LOWENSTEIN, P.J., LAURA DENVIR STITH, and NEWTON, JJ.

NEWTON, Judge.

Donna Portis, the decedent, received a mammogram on June 15, 1994, and Dr. James Greenhaw, a radiologist at Community Hospital Association, Inc., (hereafter referred to as the hospital,) read it the following day. He concluded that some scattered small microcalcifications were present but failed to identify the cancerous masses that were present in the mammogram.

Approximately one month later, Ms. Portis felt a firmness in her right breast. She sought treatment from her family doctor, Dr. James Hunter, on December 8, 1994. Dr. Hunter recommended that Ms. Portis have another mammogram performed, and on January 18, 1995, that mammogram showed that Ms. Portis had significant masses in her breast. She underwent a biopsy and mastectomy a week later. The tumor had grown from two centimeters in June 1994, to eight centimeters in January 1995.

Following the surgery, Ms. Portis underwent chemotherapy. Upon completing the chemotherapy, there was no detectable evidence of cancer, and the doctors declared her to be in remission. But because of the large size of the tumor and the extensive number of lymph nodes involved, she was at high risk for recurrence. Although the high-dose chemotherapy treatment was risky and experimental, as a preventative measure, Dr. Douglas Jones, Ms. Portis' treating oncologist, recommended that she see Dr. James Commers, another oncologist. He recommended and administered the high-dose chemotherapy treatment. Ms. Portis began the treatment in July 1995, and died on October 1, 1995, of veno-occlusive liver disease, a complication from the high dose chemotherapy she received.

Mr. David Portis, her husband, filed a wrongful death and lost-chance of survival action against Dr. James Greenhaw and the hospital for the death of his wife. Mr. Portis, however, withdrew his lost-chance of survival cause of action at trial. On September 28, 1999, the case went before a jury in Worth County with the Honorable John C. Andrews presiding. The jury awarded damages in the amount of $775,000 and assessed eighty-percent fault to Dr. Greenhaw and twenty-percent fault against Ms. Portis. The jury found the hospital was not liable. The court entered judgment on November 12, 1999, and Dr. Greenhaw filed post-trial motions, which the court denied. This appeal followed.

Dr. Greenhaw raises six points on appeal. First, Dr. Greenhaw alleges that the trial court erred by denying his motion for directed verdict and motion judgment notwithstanding the verdict (JNOV) because plaintiff failed to make a submissible case of wrongful death in that he failed to establish a causal relationship between the alleged conduct of Dr. Greenhaw and Ms. Portis' death. Second, he argues that the court erred in denying his motion for new trial for the following reasons: (1) the court made a prejudicial error by failing to find that venire person, Mr. Frankie Ross, intentionally failed to disclose his prior involvement in lawsuits because he failed to respond to questions asked during *voir dire* concerning prior litigation, and the trial court denied Dr. Greenhaw a hearing on the matter; (2) the verdict directing instruction, Number 6, was not supported by the evidence, and was therefore, misleading, confusing, and prejudicial because it created a roving commission for the jury

to speculate as to what constituted "any detectable sign of cancer" on the mammogram films; (3) overruling defendants' objection concerning questions to plaintiff's expert witness, Dr. Standiford, seeking his opinion as to the acceptance of high-dose chemotherapy by oncologist in June 1994, because the questions were without proper foundation and called for speculations, in that Dr. Steven Standiford is not an oncologist and the questions sought Dr. Standiford's opinion as to what oncologists believed and thought in June 1994; (4) the court abused its discretion by excluding relevant evidence of decedent's prior uterine cancer; and (5) the court allowed counsel to misstate or misquote evidence while examining a witness by asking improper hypothetical questions of Dr. Dean Tamisiea, Dr. Greenhaw's expert witness.

## I. Submissible Case

### A. Standard of Review

In reviewing a trial court's rulings on motions for JNOV, we review the evidence in the light most favorable to the jury's verdict to determine whether the plaintiff made a submissible case.[1] We look at all favorable evidence and reasonable inferences flowing therefrom, discarding all unfavorable evidence and inferences.[2]

### B. Legal Analysis

■ Mr. Portis alleged in his wrongful death petition that Dr. Greenhaw and the hospital negligently treated, interpreted and diagnosed a mammogram administered to Donna Portis, and that this negligence caused or contributed to her death. In order to succeed under a claim for medical malpractice, Mr. Portis must prove the requisite elements of a medical malpractice claim.[3] The plaintiff must show that the defendant's act or omission failed to meet the requisite standard of care, that the defendant performed the act or omission negligently, and that there was a causal connection between the act or omission and the injury the plaintiff sustained.[4] In addition, the plaintiff must show that the doctor's negligence caused the decedent's death.[5] In other words, the plaintiff in a wrongful death action, must prove that " 'but for' the actions or inaction of the defendant, the decedent would not have died." [6]

■ "Proof of causation requires expert medical testimony '[w]hen there is a sophisticated injury, requiring surgical intervention or other highly scientific technique for diagnosis.' " [7] In this case, expert medical testimony was required to establish whether within a reasonable degree of medical certainty, Dr. Greenhaw's negligent act of failing to diagnose Ms. Portis' cancer in June 1994, caused her death.

When a party relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of certainty. When an expert merely testifies that a given action or failure to act "might" or "could have" yielded a given result, though other causes are possible, such testimony is devoid of evidentiary value.[8]

The pertinent testimony establishing causation took place between Mr. Portis' counsel and Dr. Standiford:

1. *Seitz v. Lemay Bank & Trust Co.,* 959 S.W.2d 458, 461 (Mo. banc 1998).

2. *Id.*

3. *Super v. White,* 18 S.W.3d 511, 515 (Mo. App. W.D.2000) (citations omitted).

4. *Id.* at 516 (citations omitted).

5. § 537.080; *Super,* 18 S.W.3d at 516 (citations omitted).

6. *Baker v. Guzon,* 950 S.W.2d 635, 644 (Mo. App. E.D.1997).

7. *Super,* 18 S.W.3d at 516 (*quoting Brickey v. Concerned Care of the Midwest, Inc.,* 988 S.W.2d 592, 596 (Mo.App. E.D.1999)).

8. *Baker,* 950 S.W.2d at 646 (*quoting Tompkins v. Cervantes,* 917 S.W.2d 186, 189 (Mo.App. E.D.1996)) (internal citations omitted).

Q: What affect did the high dosage chemotherapy then have on Donna Portis?

A. The complications of the high-dose therapy led to her death.

\* \* \*

Q. Doctor, do you have an opinion within a reasonable degree of medical certainty that Donna Portis' tumor was growing from June of 1994 to January of 1995?

A. Yes.

Q. What is your opinion?

A. It grew significantly during that period of time.

Q. And so do you have an opinion within a reasonable degree of medical certainty as to whether or not Donna Portis would have required high-dose chemotherapy if her tumor had been found in June of 1994?

A. Yes.

Q. And what do you base that opinion on, sir?

A. On my experience with managing many patients with breast cancer and coming up with their treatment plans and the fact that her tumor at that point in time would have been considerably smaller and considerably earlier stage.

Q. How would you have staged her tumor at that point in time?

A. She would have been a stage II cancer which means that was smaller than five centimeters in size and is one piece and had—perhaps did not have lymph nodes involved.

Q. And based upon your assessment of her condition in June 20 of 1994 do you have an opinion within a reasonable degree of medical certainty whether or not she would have required high-dose chemotherapy as part of her treatment if the cancer had been discovered at that time?

A. Yes.

\* \* \*

Q. I believe the question that was pending to you was what is your opinion as to whether or not Donna Portis would have required high-dose chemotherapy as part of her treatment if the tumor had been discovered in June of 1994?

A. It's my opinion she would not have required high-dose chemotherapy at that time.

Q. (By Mr. Murphy) Dr. Standiford, do you have an opinion within a reasonable degree of medical certainty as to whether or not the delay occasioned by the failure to properly interpret the mammogram film on June the 15th of 1994 by Dr. Greenhaw and Community Hospital caused the death of Donna Portis?

A. Yes.

Q. What is your opinion?

A. That had her cancer been diagnosed in June of 1994 she would not have required high-dose chemotherapy and therefore would not have died at that time of the consequence of high-dose chemotherapy.

■ In *Baker*, the court held that similar testimony was sufficient to establish causation. The defendant alleged that the trial court erred in overruling his motions for directed verdict and JNOV because the plaintiffs failed to make a submissible case of wrongful death by failing to present evidence establishing a causal connection between the doctor's conduct and the decedent's death. One of the expert witnesses testified that it was his opinion within a reasonable degree of medical certainty that the defendant doctor deviated from the standard of care and that the negligence more probably than not caused the decedent's death. Likewise, Dr. Standiford provided evidence to a reasonable degree of medical certainty that the failure to diagnose Ms. Portis' cancer in June 1994 caused her death, thus, establishing causation.

Dr. Greenhaw relies on *Morton v. Mutchnick*,[9] to show that Mr. Portis failed to establish the "but for" element. In *Morton,* the plaintiff brought a wrongful death action and lost chance of recovery against the physicians and hospital based on negligence in failing to diagnose the decedent and provide treatment for acquired immune deficiency syndrome. Our court held that the decedent's death was not caused from a failure to diagnose his condition. Instead, his death was the result of a pre-existing disease. This case is distinguishable.

The plaintiff in *Morton* had a pre-existing condition and apparently an incurable disease. Ms. Portis had breast cancer, a disease that was curable, and *but for* the misdiagnosis by Dr. Greenhaw, she would not have needed the high dosage of chemotherapy that caused her death. The evidence indicates that she had breast cancer in June 1994. Her body was free from cancer at the time of her death. The evidence also indicates that she died from veno-occlusive liver disease, which was caused from the high dosage of chemotherapy Ms. Portis underwent prior to her death. There is no evidence that she had the liver disease in June 1994 or prior to that date; therefore, she did not die from a pre-existing condition.

## II.  Motion for New Trial

### A.  Juror Misconduct

The trial court denied Dr. Greenhaw's motion for new trial and at the hearing for his motion, the trial court denied his oral request for an additional hearing on the issue of juror misconduct. Dr. Greenhaw alleged that venire person, Frankie Ross, failed to disclose his involvement in three separate pieces of litigation.

Missouri has consistently and uniformly held that granting of a new trial on the grounds of juror misconduct lies within the sound discretion of the trial court.[10] Issues relating to alleged juror misconduct are left to the sound discretion of the trial court. Therefore, rulings on such matters will not be disturbed on appeal absent a clear showing of abuse of discretion, which occurs when the ruling offends the logic of the circumstances or was so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful consideration.[11]

The court must first determine whether a venire person's nondisclosure is intentional or unintentional.

> Intentional nondisclosure occurs: 1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable. . . . Unintentional nondisclosure exists where, for example, the experience forgotten was insignificant or remote in time, or where the venireman reasonably misunderstands the question posed.[12]

The trial court has sound discretion in determining whether nondisclosure is intentional or unintentional and its ruling will be disturbed on appeal only for an abuse of discretion.[13] Bias and prejudice are presumed when a juror intentionally

9.  904 S.W.2d 14 (Mo.App. W.D.1995).

10.  *Mathis v. Jones Store Co.,* 952 S.W.2d 360, 364 (Mo.App. W.D.1997) *(citing Berry v. Allgood,* 672 S.W.2d 74 (Mo. banc 1984)).

11.  *Richardson v. State Highway & Transp. Comm'n,* 863 S.W.2d 876, 881 (Mo. banc 1993) (citations omitted).

12.  *Schultz v. Heartland Health System, Inc.,* 16 S.W.3d 625, 627 (Mo.App. W.D.2000) *(quoting Williams by Wilford v. Barnes Hosp.,* 736 S.W.2d 33, 36 (Mo. banc 1987)).

13.  *Aliff v. Cody,* 987 S.W.2d 439, 442 (Mo. App. W.D.1999) *(citing Williams by Wilford,* 736 S.W.2d at 36).

withholds material information.[14] "Questions and answers pertaining to a prospective juror's prior litigation experience are material." [15]

■ During *voir dire,* counsel asked the prospective jurors about their prior litigation history, including whether or not they had ever been a party to a suit. Mr. Portis' attorney asked, "we would like to know about any experience you have had in suing somebody or in being sued. If there is anything embarrassing that you don't want to visit about openly, come up to the bench. Most of these things are matters of public record. Let me ask this group whether any of you have ever sued anybody?" As a follow-up, counsel asked, "Have any of you been sued?" A few jurors affirmatively responded to the questions, and counsel posed several follow-up questions to those jurors in order to determine if they could be fair and impartial. Mr. Ross did not speak up. He remained silent throughout this line of questioning. His silence establishes nondisclosure. Subsequently, Mr. Ross was chosen to serve on the jury.

■ After trial, Dr. Greenhaw discovered that Mr. Ross had in fact been involved in prior litigation. He was the defendant in two separate foreclosure actions in Oklahoma, one in 1990 and another in 1997, and he was involved in a Chapter 7 bankruptcy case in Oklahoma in 1996. Therefore, Mr. Ross' failure to disclose his involvement in these actions may have created bias and prejudice against Dr. Greenhaw. Consequently, Dr. Greenhaw alleges that he would have peremptorily stricken Mr. Ross because of his bankruptcy.

The court held a hearing on Dr. Greenhaw's motion for new trial. He filed an affidavit from Pamela C. Woolsey, his counsel, stating that she had learned through an investigator that Mr. Ross failed to disclose his involvement in prior litigation. She stated that she had discussed this matter with Mr. Ross, and he said that he did not disclose the matter to the court because he did not feel his prior lawsuits were relevant or important.

At the hearing for the motion for new trial, Dr. Greenhaw's counsel orally moved the court to hold a hearing in order to examine Mr. Ross. The court denied the request.

Mr. Portis argues that Dr. Greenhaw had ample opportunity to present evidence of Mr. Ross' nondisclosures regarding his prior lawsuits at the hearing for the motion for new trial. He could have admitted an affidavit from venire person Ross, but he failed to do so. He could have subpoenaed Mr. Ross as a witness, but failed to do so. Furthermore, since Dr. Greenhaw failed to present substantial evidence on the issue of juror misconduct at the hearing for the motion for new trial, the trial court properly denied his request for another hearing to present evidence on this issue. We agree.

Rule 78.05 provides counsel guidance when preparing for after-trial motion hearings. It allows counsel to file affidavits in connection to a motion for new trial when it is based on facts not contained in the record.[16] Further, the rule states that "[d]epositions and oral testimony may be presented in connection with after-trial motions." [17]

Dr. Greenhaw argues that he was not aware that evidence would be presented on the issue of juror misconduct at the hearing for the motion for new trial. He claims that he noticed up the hearing as oral argument on the motion, not an evidentiary hearing, therefore, he did not consider it necessary to subpoena Mr. Ross or submit his affidavit. Dr. Greenhaw's counsel submitted only his attorney's

---

**14.** *Schultz,* 16 S.W.3d at 627 (citations omitted).

**15.** *Id.* (*quoting Brines v. Cibis,* 882 S.W.2d 138, 140 (Mo. banc 1994)).

**16.** Rule 78.05 Missouri Court Rules (2000).

**17.** Rule 78.05 Missouri Court Rules (2000).

affidavit for introduction into evidence, which was hearsay as to the alleged litigation and as to any comments of Mr. Ross. Further, the affidavit gave no evidence of any prejudice. No additional evidence was presented.

When defendant alleges juror misconduct, he is responsible for presenting evidence through testimony or affidavits of any juror, or other witness either at trial or at the hearing on his motion for new trial.[18] In addition, Dr. Greenhaw has the burden of proving his allegations on his motion for new trial.[19]

Therefore, we find that the trial court gave Dr. Greenhaw ample opportunity to present evidence on the matter of juror misconduct during the hearing on the motion for new trial. Moreover, Dr. Greenhaw failed to present substantial evidence proving that Mr. Ross failed to disclose his involvement in prior lawsuits at that hearing. Furthermore, the trial court did not abuse its discretion by denying Dr. Greenhaw's oral motion for a subsequent evidentiary hearing on this matter. Point denied.

## B. Jury Instruction Number 6

Dr. Greenhaw contends that the trial court erred by submitting the verdict-directing instruction, Instruction No. 6, because it was not supported by the evidence causing it to mislead and confuse the jury and prejudicing Dr. Greenhaw. He argues that by using the phrase "detectable sign of cancer" rather than "microcalcifications" in the instruction created a roving commission. We disagree.

The trial court has discretion when determining whether jury instructions are confusing or misleading.[20] Moreover, "the trial court has the best opportu-

nity to decide whether an instruction is misleading or confusing and, on review, its rulings thereon will not be disturbed absent a showing of an abuse of discretion."[21]

Dr. Ticen testified that microcalcifications can be a sign of cancer and that they may be the only sign of cancer. Dr. Standiford testified that microcalcifications could be suggestive of cancer, suspicious for cancer, and sometimes virtually diagnostic. Dr. Ticen also testified that calcifications could be benign. Furthermore, Dr. Ticen testified that most microcalcifications are benign. Therefore, if the word "microcalcifications" was substituted for the phrase "detectable sign of cancer" the jury would have been able to find Dr. Greenhaw liable if he failed to report any microcalcifications regardless of whether they were benign or malignant. The court did not abuse its discretion by submitting Instruction No. 6 with the "detectable sign of cancer" phrase, and further, the instruction was not misleading, confusing or prejudicial.

## C. Expert Testimony

Next, Dr. Greenhaw argues that the trial court abused its discretion by allowing expert testimony from Dr. Standiford. He alleges that Dr. Standiford was not qualified to testify regarding whether oncologists accepted high-dose chemotherapy in June 1994, because there was no foundation for the questions and they called for speculation. In order to substantiate his argument, he argues that Dr. Standiford is not an oncologist, and that he must have relied on others' opinions for his testimony as to what is accepted in the oncology profession.

---

**18.** *See State v. Dunn,* 21 S.W.3d 77, 84 (Mo. App. S.D.2000).

**19.** *State v. Potter,* 711 S.W.2d 539, 541 (Mo. App. E.D.1986) (citations omitted).

**20.** *Hutson v. BOT Investment Co., Inc.,* 3 S.W.3d 878, 883 (Mo.App. S.D.1999) (citations omitted); *see also Heartland Stores, Inc. v. Royal Ins. Co.,* 815 S.W.2d 39, 41 (Mo.App. W.D.1991).

**21.** *Id.* (citations omitted).

The trial court has discretion to determine whether a witness qualifies as an expert and that decision will not be set aside unless that discretion has been abused.[22] "An expert's opinion must be founded on substantial information and not mere conjecture or speculation, and there must be a rational basis for the opinion." [23] The trial court is not required to decide whether there is perhaps another better-qualified witness.[24] Instead, the trial court must determine whether the expert witness would assist the jury in understanding the evidence and whether the expert is qualified to do that based on his "knowledge, skill, experience, training, or education." [25] "Substantial practical experience in the area in which the witness is testifying is a permissible source of expertise." [26] Furthermore, an expert must be shown to have "sufficient experience and acquaintance with the phenomena involved." [27]

Dr. Standiford has been a surgical oncologist who has additional training, specifically in the management of cancers. As an oncologist, he specializes in cancer treatments. In addition, as a surgical oncologist, he also performs surgery in connection with cancer treatments. He graduated from New Jersey Medical School in 1981, and began his internship in general surgery. He served several fellowships including one in surgical oncology, which allowed Dr. Standiford an opportunity to research on animals, some of the processes in cancer. He is on the faculty at Ellis Fischel Cancer Center, which is the cancer section of the university medical school. He was the Associate Director of Surgery, Director of the Intensive Care Units, Medical Director of the Clinics, Director of the Cancer Screening Program, the Assistant Chief of Surgery and deputy Chief in the Division of Surgical Oncology, Chief of the Section of Breast Diseases in the Division of Surgical Oncology, Medical Director of the Breast Center at Ellis Fischel, and currently Chief of the Department of Surgical Oncology. His practice is ninety percent breast cancer, and he is responsible for planning and developing the breast center and providing comprehensive breast cancer care, evaluating people with breast complaints, performing biopsies, making diagnoses of what breast diseases people have, developing treatment plans, performing surgeries and continuing long term treatments and follow-ups when necessary. Furthermore, he has had significant experience with high dosage chemotherapy procedures and discussed this procedure with patients.

Dr. Standiford, clearly, was qualified to testify regarding the high-dose chemotherapy regiments, and Mr. Portis sufficiently laid a foundation as to this expert witness's qualifications. The trial court did not abuse its discretion by allowing Dr. Standiford's testimony as an expert witness.[28]

22. *Estate of Treece v. Stillie*, 868 S.W.2d 111, 113 (Mo.App. W.D.1993) (citations omitted).

23. *Mo. Highway and Transp. Comm'n v. Kansas City Cold Storage, Inc.*, 948 S.W.2d 679, 685 (Mo.App. W.D.1997) (citations omitted).

24. *Id.*

25. § 490.065; *see also Sampson v. Missouri Pacific R. Co.*, 560 S.W.2d 573, 586 (Mo. banc 1978).

26. *Emerson Elec. Co. v. Crawford & Co.*, 963 S.W.2d 268, 271 (Mo.App. E.D.1997) (citations omitted).

27. *State v. Mahan*, 971 S.W.2d 307, 316 (Mo. banc 1998) (*quoting State v. Rhone*, 555 S.W.2d 839, 841 (Mo. banc 1977)).

28. In reviewing this issue, we found that an orthopedist could testify as to the reasonable standard of medical care and whether the conduct of a radiation oncologist measured up to that standard. *See supra Estate of Treece*, 868 S.W.2d at 113. Further, *Estate of Treece* cited other cases which allowed medical doctors in a different field of specialization than the defendant doctor to testify as an expert to the requisite standard of care. *Swope v. Printz*, 468 S.W.2d 34, 40 (Mo.1971) (psychiatrist testified to acceptable medical standards in field of thyroid surgery); *Harris v. Bales*, 459 S.W.2d 742, 747–51 (Mo.App. 1970) (osteopath qualified to testify as expert on standard of care in case against medical doctor involving reduction of bone fractures.)

Moreover, Dr. Greenhaw's contention that Dr. Standiford's testimony as to the opinions of oncologist was speculative is without merit. Dr. Standiford's opinions as to a recommended course of treatment and oncologists' standard of care were based on facts known to him at or before the trial which others in the field would reasonably rely upon in forming an opinion, and therefore, were admissible.[29] Point denied.

### D. Exclusion of Evidence

Dr. Greenhaw also alleges that the trial court erred in excluding evidence of the decedent's prior uterine cancer. The admission or exclusion of relevant evidence rests in the sound discretion of the trial court. Only when the trial court abuses that discretion does the exclusion of evidence constitute reversible error.[30] "Failure to admit evidence does not mandate a reversal of a judgment unless the error materially affected the merits of the action."[31] We will reverse only where the error is so prejudicial as to deny Dr. Greenhaw a fair trial.[32]

Abuse of discretion is a ruling clearly against the logic of the circumstances, so arbitrary and unreasonable as to shock the sense of justice, and lacking careful consideration.[33] A trial court has great discretion when determining the admissibility of evidence. "We will not reverse unless there is a substantial or glaring injustice."[34] If any ground exists for excluding the evidence, we will uphold the trial court's decision to exclude it.[35] Therefore, we are not bound by either the trial court's reasons for refusing the evidence or the complaining party's objections to the admissibility of the evidence.[36]

As Mr. Portis points out, we must first determine whether Dr. Greenhaw properly preserved this issue for appeal. Mr. Portis requested that the court preclude Dr. Greenhaw from introducing any evidence of Ms. Portis' uterine cancer in his motion in limine. The court sustained Mr. Portis' motion in limine in a pre-trial hearing.

A ruling on a motion in limine is interlocutory and not appealable.[37] It "is merely a preliminary expression of the court's opinion as to the admissibility of the evidence" and the court can change its ruling anytime during the trial if presented with the proper circumstances.[38] In order to preserve the issue for appeal, Dr. Greenhaw should have attempted to introduce the excluded evidence during the trial, and if an objection was made and sustained, he is generally required to make an offer of proof demonstrating why the excluded evidence was relevant and material.[39]

The courts have established two purposes for the offer of proof: (1) preserve the record for appeal so the appellate court understands the scope and effect of the questions and proposed answers in considering whether the trial

29. § 490.065.3.

30. *Brown v. Hamid,* 856 S.W.2d 51, 56 (Mo. banc 1993).

31. *Aliff,* 26 S.W.3d at 315 (*quoting Envtl. Waste Mgmt., Inc. v. Indus. Excavating & Equip., Inc.,* 981 S.W.2d 607, 613 (Mo.App. W.D.1998)).

32. *State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998) (citations omitted).

33. *Rasse v. City of Marshall,* 18 S.W.3d 486, 489 (Mo.App. W.D.2000) (citations omitted).

34. *Aliff,* 26 S.W.3d at 315 (*quoting State ex rel. Mo. Highway and Transp. Comm'n v. Pracht,* 801 S.W.2d 90, 93 (Mo.App. E.D. 1990)).

35. *Aliff,* 26 S.W.3d at 315.

36. *Id.* at 313–15.

37. *Evans v. Wal–Mart Stores, Inc.,* 976 S.W.2d 582, 584 (Mo.App. E.D.1998) (citations omitted).

38. *Id.* (*quoting Brown v. Hamid,* 856 S.W.2d 51, 55 (Mo. banc 1993)).

39. *Id.*

court's ruling was proper; (2) it allows the trial court, once again, to consider the admissibility of the evidence after it is presented.[40] There is a narrow exception to the required offer of proof. If "there is a complete understanding, based on the record, of the excluded testimony; the objection is to a category of evidence, rather than to specific testimony, and the record reveals the excluded evidence would have helped the proponent," the offer of proof may not be necessary.[41] But that exception does not apply here.

Although Dr. Greenhaw argues that Ms. Portis' prior uterine cancer was relevant and material, he failed to make the requisite offer of proof in order to preserve this issue for appeal. The only time the uterine cancer was mentioned during trial was during a brief colloquy between the attorneys and the judge over admitting Ms. Portis' hospital discharge records. This is insufficient in preserving the exclusion of evidence for appeal, and therefore, we deny Dr. Greenhaw's point.

### E. Hypothetical Question

Finally, Mr. Greenhaw argues that the trial court erred in denying his motion for new trial because it abused its discretion by allowing counsel to misstate or misquote evidence during the examination of Dr. Tamisiea. Dr. Greenhaw objected to an allegedly improper hypothetical question posed during Mr. Portis' cross-examination of Dr. Tamisiea. We will assume that Dr. Greenhaw is referring to the following questions since he failed to specifically state them in his brief:

Q. Referring you back to Dr. Greenhaw's sworn testimony of December 5, 1996, let me read his testimony to you at page 62. This is Dr. Greenhaw talking: *I reviewed the film—Exhibit[s] 5 and 6—and I would make the same identical report right here this minute, December 5, 1996, as I made in June 1994 in that there is no clumped microcalcifications on the June 1994 film. There is a small calcifications (sic) scattered through a broad area on one view of the breast. Is that the right breast? Yes. There is no clumped microcalcifications on that examination.*

So do you understand now that, that Dr. Greenhaw, in fact, perceived, he saw the microcalcifications in June and he saw the microcalcifications in December of 1996, and he still would maintain that there was nothing suspicious that would have required him to note anything in his report, nor would it have required him to make any follow-up recommendations? [42]

Mr. Keplinger: Object as misuse of a deposition, lacks foundation, and an improper hypothetical. You may answer.

\* \* \*

Q. Do you understand that now, having heard his testimony?

A. Yes.

Mr. Keplinger: Same objections.

Q. Would you now conclude, Doctor, with the benefit of that testimony from Dr. Greenhaw, that Dr. Greenhaw, in fact, perceived that there were calcifications and failed to put them in his report and failed to appreciate the significance of what he saw? [43]

Mr. Keplinger: The same objections. There's been no testimony that Dr. Greenhaw had any recollection of what happened on June of '94, but you're representing to the witness that he did.

\* \* \*

The Witness: With what he says there, I think he needed to probably at least describe the calcifications and probably

40. *Id.* (*citing Wilkerson v. Prelutsky,* 943 S.W.2d 643, 646 (Mo. banc 1997)).

41. *State v. Hirt,* 16 S.W.3d 628, 633 (Mo.App. W.D.2000) (citations omitted).

42. For clarity, we will refer to this question as question one throughout the analysis.

43. This question will be referred to as question two.

get additional images as a diagnostic tool, and I think it probably was a problem with analysis, it seems more than anything, that he didn't perceive them initially—I mean, if he did perceive them initially.

 During the deposition, Dr. Greenhaw failed to make a specific objection describing how Mr. Portis misstated or misquoted the evidence. "We only consider those omissions or misstatements in hypothetical questions to which specific objection has been made specifying what is missing or improperly included."[44] But Dr. Greenhaw objected to question one during the trial claiming that it was an improper hypothetical.[45] In his objection, he stated that Dr. Greenhaw did not testify as to what he did in June 1994 because he did not remember, therefore, question one is a hypothetical that misquoted the deposition. The controversy arises from the italicized portion of question one *supra* where Mr. Portis quotes Dr. Greenhaw's deposition testimony. Initially, the trial court sustained Dr. Greenhaw's objection to the question, but after hearing further arguments from both sides, the court changed its ruling and allowed Mr. Portis to read the question and answer to the jury. The portion of Dr. Greenhaw's deposition testimony contained in question one is quoted verbatim from the deposition transcript.

 Furthermore, Dr. Greenhaw's contention that these questions were hypothetical in nature is unfounded. A hypothetical question is a "question framed in such a manner as to call for an opinion from an expert based on a series of assumptions claimed to have been established as fact by the evidence in a case."[46] Mr. Portis was not asking Dr. Tamisiea to assume any fact. On the contrary, he read

Dr. Greenhaw's deposition verbatim and asked the witness if he agreed with counsel's characterization of the testimony. Therefore, without the proper objection, the issue is not preserved for appeal. Point denied.

### III. Conclusion

After a thorough review of the record, the judgment of the trial court is affirmed.

LOWENSTEIN and LAURA DENVIR STITH, JJ., concur.

and no foundation, but he does not raise these objections on appeal, therefore, we will not address them.

---

**44.** *Harashe v. Flintkote Co.,* 848 S.W.2d 506, 510 (Mo.App. E.D.1993) (*citing Nagel v. Bi–State Dev. Agency,* 567 S.W.2d 644 (Mo. banc 1978)).

**45.** Dr. Greenhaw objects to many of the questions based on improper use of the deposition

**46.** Black's Law Dictionary 743 (6th ed. 1990).