

# In the
# Missouri Court of Appeals
## Western District

NICK SAVAGE,

        Appellant,

v.

KANSAS CITY POWER & LIGHT COMPANY,

        Respondent.

**WD79299**

**OPINION FILED:**

**January 17, 2017**

Appeal from the Circuit Court of Clay County, Missouri
The Honorable Larry D. Harman, Judge

Before Division Three:
Alok Ahuja, P.J., Victor C. Howard, and James Edward Welsh, JJ.

Nick Savage appeals from the circuit court's judgment following a jury trial in which the jury assessed zero percent fault to Kansas City Power and Light (KCP&L) and 100 percent fault to Savage on Savage's personal injury claim against KCP&L. Savage contends that the circuit court erred in submitting KCP&L's comparative fault instruction to the jury because the instruction was not supported by substantial evidence and attributed a duty to him that did not exist. We affirm.

The evidence established that Savage lived at the corner of NE 45th Street and Bellefontaine in Kansas City, Missouri, which is within the Northland Service Center of KCP&L's electrical grid. On the north side of Savage's home, a primary, uninsulated distribution

power line (the primary line) runs along 45th Street. The power from this primary line conducts a high voltage electrical current, too high to go to a house directly. Therefore, the voltage from the primary line is sent through a transformer that reduces the voltage, which is then ran along secondary lines. The individual houses in the area get electricity off of secondary lines from service poles via electrical lines called service drops. For Savage's house, the service pole is on the opposite side of the yard from the primary line in the southeast corner of his backyard. The service drop line runs essentially diagonal across Savage's yard from the service pole to Savage's home.

On Sunday, August 7, 2011, a strong thunderstorm damaged a large silver maple tree in Savage's backyard. The tree sat on the side of the yard closest to 45th Street and close to the primary line. As a result of the storm, a limb from the tree fell on the service drop line that ran across Savage's backyard. The weight of the limb pulled the service drop line down and pulled the electrical connection off of Savage's house. Although the weather head connection and electrical meter were pulled off Savage's house, the service drop line remained connected. The loose and damaged service drop line wire was down across Savage's yard and draped over a children's swing set. As a result of the damage, Savage did not have any electrical power in his house.

Savage telephoned KCP&L and reported that he had no electrical power in his house and that the electrical box and the service drop line had been ripped off the back of his house because of the storm damage. Later that evening, a KCP&L lineman arrived to investigate the circumstances. The lineman testified that he could not recall working at Savage's house, but Savage testified that the lineman left the live service drop line down, told Savage to stay out of the backyard, and told him that someone would be out in the next couple of days to take care of

2

things.  When Savage inquired who would be responsible for cleaning up the tree and getting the electrical box and connection back on the house, the lineman told Savage that the homeowner would be responsible for doing those things.

The next day, on Monday, August 8, Savage called KCP&L again, reported that the downed service drop line was making some noises, and asked when KCP&L would be sending someone out to work on it.  KCP&L said that they would send someone out to get it taken care of and told Savage that he was responsible for taking care of the tree "and getting everything fixed back the way it should be."

On Tuesday, August 9, KCP&L Lineman Gerald Peterson went to Savage's house to disconnect the live service drop line.  He removed the live service drop line that had been draped on the swing set and coiled it up and put it at the foot of the service poll.  At that point, Peterson let Savage know that it was safe to work in the backyard.  Peterson told Savage that it was his responsibility "to put the riser and the new meter can [up]" and "to mount the riser up to the weather head" with the wire to give KCP&L a point of attachment for the service drop.  Peterson informed Savage that, once all of that was done, Savage should call KCP&L and someone would come back and reconnect his service line to the weather head.

At trial, Peterson did not deny that he told Savage that he would be responsible for cleaning up the tree; Peterson merely said he did not remember telling Savage that.  Peterson said that he did not recall any conversations with Savage about his plans for trimming the tree, but Peterson said nothing was said about Savage climbing and trimming trees.  Peterson also said that he did not have any conversations with Savage telling him that he needed to notify KCP&L before trimming any tree. Peterson acknowledged that he did not pay attention to how many broken limbs there were, how many broken tree limbs were in the tree hanging loose, or whether

3

there were any tree branches growing off the big tree that were still growing over the service drop area of Savage's house. Although Peterson said that he could not remember whether there were any tree limbs hanging over the area where the service drop line would be, Peterson said that, before attaching the service drop line, "you usually look up and see if there's anything in the way," and, from what he could tell, "it was clear." Peterson said that, if the point of attachment had been on Savage's house, he could have reattached the service drop line at that time. Peterson also said that he never looked at the branches of tree to see where they were in relationship to the primary line.

Later that morning, Savage, with the help of his father, his brother, and a friend, began cleaning up the backyard. Savage cleaned up the area of the yard under where the service drop line would be restrung. Savage then took photographs of the area that showed that the yard beneath where the service drop line would be reconnected had been cleaned up. After cleaning up the service drop area, Savage decided to trim branches on the tree "that hung over the power line or where the drop line was supposed to go" and to "clean up all the limbs on [the] house side of the tree" to eliminate future problems. Savage used a ladder to climb up into the tree and used a small rope, tied from his belt to a small chain saw, to lift up the chain saw for use in the tree. After climbing into the tree, Savage climbed onto a large branch closest to the service drop and his house. Savage cut a couple of branches over the service drop area. He then moved to the "parent branch" of the tree to cut the "subject limb"[1] that resulted in his injuries. The "subject limb" had not been damaged in the storm. Savage acknowledged that he knew where the primary line was and knew that the "subject limb" could come into contact with the primary line

---

[1] Throughout the trial, the parties referred to the limb that caused Savage's injuries as the "subject limb." For consistency purposes, we will also refer to the limb as the "subject limb."

4

when he was cutting it. Savage said, however, that he believed the "subject limb" would only brush against it. As Savage prepared to cut the "subject limb," he wrapped his left arm and left leg around the trunk of the "subject limb" to secure himself, and, with his right foot standing on the "parent branch" and holding the chain saw above his head, he began cutting the "subject limb." Savage took no other precautions to prevent himself from falling out of the tree. When he cut the "subject limb," the limb fell onto the high voltage primary line, conducting electricity, and electrocuting Savage. Savage was rendered unconscious and fell from the tree, falling about 25 feet.

As a result of the incident, Savage suffered electrical burns to his left arm and left leg, and he had compression fractures at levels T-10 and T-11, resulting in the severance of his spinal cord leaving him paralyzed and losing the use of his legs.

Savage never told Peterson that he intended to prune the tree near the primary line. According to Peterson's notes taken after Savage was injured, Peterson stated, "when I left that morning, nothing was said about the customer cutting trees." According to Peterson, if KCP&L had known Savage was going to prune the tree over the primary line, Peterson would have told Savage to contact a qualified tree service or to contact KCP&L for help.

At trial, Savage acknowledged that one way to direct a cut branch away from electrical lines would have been to use a rope to pull it in the direction that you wanted to go. Savage acknowledged, however, that he did not do that when cutting the "subject limb." Savage also did not the cut the branch in a manner that it would tend to fall away from the overhead line. Savage's expert acknowledged that Savage did not make a clean cut of the subject limb; rather, Savage cut the limb so that it hinged and dropped in an arc into the primary line. According to

5

Savage's own expert, a clean cut depends on doing an undercut first and then an overcut to prevent it from hinging.

Savage filed a petition for damages against KCP&L for personal injuries resulting from the electrical shock that caused him to fall from the tree. Savage alleged that KCP&L maintained the primary uninsulated power line adjacent to Savage's Property; that tree limbs from Savage's tree were close to and above the primary line presenting an unreasonable risk of harm, and that it was reasonably foreseeable that persons would be trimming tree limbs of the tree in the backyard. Further, Savage alleged that the tree limb came into contact with the primary line because of KCP&L's failure to maintain a clearance between the tree limbs and the primary line. KCP&L alleged in its answer as an affirmative defense that Savage bore the responsibility for his injuries because he failed to notify KCP&L that he would be performing work in the trees near the power line.

A jury trial was held on August 24, 2015, through September 2, 2015. Savage offered Instruction No. 6, a comparative-fault-modified verdict director instruction setting out disjunctive allegations of negligence by KCP&L, which was given by the court. Instruction No. 6 read:

> In your verdict, you must assess a percentage of fault to [KCP&L] whether or not [Savage] was partly at fault, if you believe:
>
> First either
>
> [KCP&L] failed to use natural directional pruning to prune the parent branch to the tree trunk, or
>
> [KCP&L] failed to prune the subject branch back to the parent branch, or
>
> [KCP&L] failed to tell [Savage] that [KCP&L] would do the necessary pruning or removal to clear the service drop, or

6

[KCP&L] failed to warn [Savage] not to prune tree limbs in the Silver Maple, and

Second, [KCP&L], in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, such negligence directly caused or directly contributed to cause damage to [Savage]. The term "negligent" or "negligence" as used in this instruction means the failure to use the highest degree of care. The phrase "highest degree of care" means that degree of care that a very careful person would use under the same or similar circumstances.

KCP&L offered Instruction Number 7, a comparative fault instruction, which was also given by the circuit court. Instruction Number 7 said:

In your verdict, you must assess a percentage of fault to [Savage] whether or not [KCP&L] was partly at fault, if you believe

First, [Savage] either,

Failed to notify [KCP&L] of his plan to prune the Silver Maple, or

Cut the subject tree branch in such a way that it contacted the primary distribution power line, or

Failed to use a rope to keep the cut branch from contacting the power line, or

Failed to secure himself to the tree while pruning the subject tree branch, and

Second, in any one of or more of the respects submitted in paragraph First, [Savage] was thereby negligent, and

Third such negligence directly caused or directly contributed to cause any damage [Savage] may have sustained.

The term "negligent" or "negligence" as used in this instruction means the failure to use that degree of care than an ordinarily careful person would use under the same or similar circumstances.

Savage objected to the court's giving Instruction Number 7, arguing that no evidence supported the proposition that he had a duty or responsibility to notify KCP&L of his plan to prune the tree

7

and that the submission that he failed to secure himself to the tree while pruning was a roving commission.

The jury returned a verdict for KCP&L, finding zero percent fault on the part of KCP&L and 100 percent fault to Savage. Savage filed a motion for new trial alleging instructional error based upon the circuit court's submission of Instruction Number 7 to the jury. The circuit court denied Savage's motion for new trial. Savage appeals.

In his sole point relied on, Savage asserts that the circuit court erred in submitting KCP&L's comparative fault instruction, Instruction Number 7, to the jury because the instruction was not supported by substantial evidence and attributed a duty to him that did not exist.

Whether a jury was instructed properly is a question of law that we review de novo. *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 90 (Mo. banc 2010). When reviewing claims of instructional error, we will reverse a jury verdict on the ground of instructional error if the error resulted in prejudice that "materially affected the merits of the action." *Coomer v. Kansas City Royals Baseball Corp.*, 437 S.W.3d 184, 191 (Mo. banc 2014).

We need not address Savage's contentions that KCP&L's comparative fault instruction was not supported by substantial evidence because, even if the instruction was erroneous, Savage cannot show that the alleged erroneous instruction resulted in prejudice that materially affected the merits of the action.

The Missouri Supreme Court has emphatically stated that, where a plaintiff's verdict directing instruction requires a jury to assess a percentage of fault to the defendant if the jury believes certain factual propositions and the jury assesses no fault to the defendant, the jury verdict assessing no fault to the defendant negates any claim of prejudice to plaintiff in the giving of a comparative fault instruction, even if the instruction was erroneous. *Wilson v.*

8

*Shanks*, 785 S.W.2d 282, 285 (Mo. banc 1990); *Lee v. Mirbaha,* 722 S.W.2d 80, 82-84 (Mo. banc 1986); and *Barnes v. Tools & Machinery Builders, Inc.*, 715 S.W.2d 518, 520-22 (Mo. banc 1986). As the *Wilson* court explained:

> [W]e must assume the jury followed the instructions. Instruction No. 8 required some assessment of fault to defendant if the jury found the facts hypothesized to be true. The assessment of fault was not dependent upon and made no reference to Instruction No. 10. The jury necessarily must have concluded that one of the essential propositions was not established when it failed to assess any fault to defendant. Absent some assessment of fault to defendant, there was no prejudice in giving the contributory fault instruction.

785 S.W.2d at 285.

All three districts of the Court of Appeals have followed the Missouri Supreme Court's directions without exception. *See Rouse v. Cuvelier*, 363 S.W.3d 406, 413 (Mo. App. W.D. 2012) ("'Any error in submitting a comparative fault instruction is harmless when the jury returns a verdict attributing one hundred percent fault to the complaining party.'"); *Marion v. Marcus*, 199 S.W.3d 887, 896 (Mo. App. W.D. 2006) (Because the jury returned a verdict in favor of defendants, "'the jury was never required to reach the question of apportionment of fault.' Therefore, although the instruction contained an error, the jury never needed to consider the erroneous instruction. The error resulted in no prejudice."); *Powderly v. S. Cty. Anesthesia Assocs., Ltd.*, 245 S.W.3d 267, 279 (Mo. App. E.D. 2008) ("The absence of any assessment of fault to Defendants negates any claim of prejudice to Plaintiffs in giving the erroneous comparative fault instruction."); and *Skinner v. Leggett & Platt, Inc.*, 325 S.W.3d 520, 525 (Mo. App. S.D. 2010)[2] ("[T]he verdict in this case, finding zero fault in Respondent, negates any allegation of error in giving a comparative fault instruction.").

---

[2]Savage noted that the Southern District in 1986 was less than enthusiastic following the Missouri Supreme Court's mandate when it stated in *Bushong v. Marathon Elec. Mfg. Corp*., 719 S.W.2d 828 (Mo. App. 1986) that

Thus, in this case, the comparative fault instruction "did not materially affect the merits of the action because had the comparative fault instruction not been given, the jury would have simply rendered a verdict in [KCP&L's] favor, since they found that [Savage] did not meet his burden to show that [KCP&L's] alleged negligence was in any way the cause of the accident." *Rouse*, 363 S.W.3d at 413.

Savage argues that the rule that the absence of any assessment of fault to a defendant negates any claim of prejudice to a plaintiff in the giving of the erroneous comparative fault instruction has become "increasingly generic" and that the rule is not applicable in this case because the comparative fault instruction directly affects the verdict directing instruction given to the jury. In support of this contention, Savage relies on Instruction Number 2, which was given to the jury and instructed the jury that each instruction was "equally binding upon you" and that the jury "should consider each instruction in light of and in harmony with the other instructions" and "apply the instructions as a whole to the evidence." The instruction also stated that the "order in which the instructions are given is not indication of their relative importance." Savage asserts that Instruction Number 2 required the jury to review and consider both Instruction Number 7 and Instruction Number 6. Savage argues:

> There was no indication or instruction to the jury that if they found for [KCP&L] under Instruction No. 6, they could skip over to the verdict form. . . . The way the instructions were presented to the jury, in parallel, there was no distinction for what order they must be evaluated in—and there was no indication to the jury that they did not consider the erroneous Instruction No. 7 and the effect that it had on Instruction No. 6.

"under the constraint of the [law], this court reaches the reluctant conclusion that although Instruction No. 7 [(arguing disjunctive theories of negligence on the part of plaintiff)] was not supported by the evidence and was erroneous, the error was not reversible" when the jury did not otherwise contribute to a general verdict for the defendant. *Id*. at 838. Enthusiastic or not, the *Bushong* court was bound to follow the most recent controlling decision of the Missouri Supreme Court. Indeed, the decisions of the Missouri Supreme Court are "controlling in all other courts," and we are constitutionally bound to follow those decisions. Mo. Const. art. 5, § 2; *Overlap, Inc. v. A.G. Edwards & Sons, Inc.,* 318 S.W.3d 219, 224 n.7 (Mo. App. 2010).

10

Instruction Number 2, however, is given in all Missouri cases since at least 1980 and would have been read to juries in every Missouri case, including all the cases that we noted above.

Savage also argues that he was prejudiced by errors in Instruction No. 7, despite the jury's assessment of zero fault to KCP&L, because the wording of Instruction No. 7 diminished or extinguished KCP&L's duties as described in Instruction No. 6. In particular, Savage argues that Instruction No. 7's statement that he may have been negligent by "[f]ail[ing] to notify [KCP&L] of his plan to prune the Silver Maple" negated the specification in Instruction No. 6 that KCP&L could be negligent for "fail[ing] to warn plaintiff not to prune tree limbs on the Silver Maple." We fail to see the necessary linkage between these aspects of Instruction Nos. 6 and 7. Nothing in the instructions indicates that KCP&L's duty to warn was contingent on Savage first having notified the company of his intention to prune the tree. Instead, any duty to warn could exist independently of Savage's duty to notify KCP&L of his specific intentions. Savage cannot establish prejudice from any errors in Instruction No. 7 on the theory that Instruction No. 7 somehow influenced the jury's reading of the specifications of negligence in Instruction No. 6.

Further, as explained by the Missouri Supreme Court, where a verdict directing instruction is self-contained, any alleged error in the comparative fault instruction does not require reversal "because the jury found no basis for liability against the defendant and returned a general verdict for the defendant under instructions not dependent on" the comparative fault instruction. *Barnes*, 715 S.W.2d at 521. In *Barnes*, the plaintiff claimed that the definition of "negligence" in the comparative fault instruction had confused the jury and undermined the verdict directing instruction. *Id*. The Missouri Supreme Court rejected this argument, noting

11

that because the verdict directing instruction was self-contained, it could not have been affected by errors in the comparative fault instruction:

> The plaintiff's problem is that Instruction No. 6 is a full and complete verdict director which commands the jury to return a verdict for the plaintiff if it finds the four facts there hypothesized. It contains no "tail" referring to erroneous Instruction No. 8. The jury returned an unequivocal verdict for the defendant, actually writing in the defendant's name as prevailing party. We must assume that it followed its instructions and would have assessed a percentage of fault against the defendant if it had found that the four hypotheses were established. The jury must necessarily have concluded that the plaintiff did not establish at least one of these four propositions by proof meeting the required standard.

*Id*.

The same is true in this case. The verdict directing instruction did not refer to any other instructions and certainly not to the comparative fault submission in Instruction Number 7. The verdict director instructed the jury to find for plaintiff "whether or not plaintiff was partly at fault." Thus, like the verdict director in *Barnes*, Instruction No. 6 was "full and complete" and stood on its own without any reference to any other instruction.

The directive that the jury consider KCP&L's fault independently of any assessment of fault to Savage is repeated on the verdict form itself. Following MAI 37.07, the verdict form begins with the following explanatory note:

> Complete the following paragraph by filling in the blanks as required by your verdict. If you assess a percentage of fault to any of those listed below, write in a percentage not greater than 100%, otherwise write in "zero" next to that name. If you assess a percentage of fault to any of those listed below, the total of such percentages must be 100%.

The verdict form then indicates that the fault assessed by the jury to all parties must total "zero OR 100%." Thus, the verdict form makes clear that the jury could assess zero fault to KCP&L without considering whether any assessment of fault to Savage was warranted under Instruction No. 7. We presume the jury followed the instructions and would have assessed a percentage of

12

fault against KCP&L if it found that Savage had proven one or more elements of his claim. The jury, however, found for KCP&L by expressly writing in "0%" fault on the verdict form. We, therefore, conclude that the absence of any assessment of fault to KCP&L would negate any claim of prejudice to Savage in the giving of the comparative fault instruction, even if the instruction was erroneous.

We affirm the circuit court's judgment.

/s/ JAMES EDWARD WELSH
James Edward Welsh, Judge

All concur.