

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| THE CURATORS OF THE UNIVERSITY OF MISSOURI, | ) ) ) | |
| | ) | WD81278 |
| Respondent, | ) ) | |
| | ) | OPINION FILED: January 8, 2019 |
| v. | ) ) | |
| GALEN J. SUPPES, | ) ) | |
| Appellant. | ) ) | |

**Appeal from the Circuit Court of Boone County, Missouri**
The Honorable Gary W. Lynch, Judge

Before Division Three: Gary D. Witt, Presiding Judge, Cynthia L. Martin, Judge and
Anthony Rex Gabbert, Judge

Appellant Galen Suppes ("Suppes") appeals the judgment of the Circuit Court of

Boone County, Missouri, which, following a jury trial, found him liable to The Curators of

the University of Missouri ("University") for breach of contract and breach of loyalty

claims. The jury awarded the University $300,000.00 on each claim. On appeal, Suppes

alleges nine points of error. We affirm.

# Factual Background[1]

The University hired Suppes as an associate professor in the College of Engineering's Department of Chemical Engineering in the fall of 2001. As a condition of his employment, the University required Suppes to sign an Appointment Notification document stating that he accepted his position "with the understanding that it is subject to all rules, orders and regulations of the Board of Curators." The University's governing rules are called the Collected Rules and Regulations ("CRRs") and Suppes agrees he was bound by the CRRs. The CRRs include "Patent and Plant Variety Regulations" which states, in relevant part:

> The University, as the employer and as the representative of the people of the state, shall have the ownership and control of any Invention or Plant Variety developed in the course of the employee's service to the University.

There are various limitations to this requirement but, in order to allow the University to exercise its rights, the regulations require that all employees disclose all inventions to the University regardless of whether the employee believes that the invention is exempt from University ownership. The University may then exercise its rights of ownership and request assignment of the invention to the University or, if the University chooses, it may waive its rights to the invention. The disclosure form which is to be submitted with notification includes an assignment clause. Only if the University affirmative waives its rights to an invention may an employee seek a patent for the invention independently.

---

[1] On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict. *Dubinsky v. U.S. Elevator Corp.*, 22 S.W.3d 747, 749 (Mo. App. E.D. 2000).

Between September 2001 and January 2008, Suppes filed at least 35 patent applications on his own or through an outside attorney who did not represent the University. Most, if not all, of these patent applications were for inventions that had not been disclosed or assigned to the University when the patent application was filed. To the extent Suppes did disclose some of his inventions, he often modified the University's disclosure form to modify or remove the assignment language. Eventually, the University became aware of the modifications and asked him to stop. However, Suppes continued to disclose his inventions on modified forms altering or deleting the assignment language. The University claims, generally, that Suppes's failure to notify the University about inventions and submitting notifications without proper assignment prevented the University from capitalizing on these inventions. Without clear assignment from Suppes the University could not justify investing in commercialization of the inventions.

The current suit stems from Suppes's failure to properly assign ownership of a technology to transform glycerol, a byproduct of biodiesel production, into propylene glycol ("PG"),[2] a valuable chemical compound used to make antifreeze.

From 2003 to 2006, Suppes's PG research was supported by a research funding agreement between the University and the Missouri Soybean Merchandising Counsel, a subsidiary of the Missouri Soybean Association ("Missouri Soybean").[3] Under the funding agreement, the University would own any inventions resulting from Suppes's research, but

---

[2] Suppes's work surrounding the transformation of glycerol into PG lead to several different patents and related technologies. For ease of discussion, the entirety of the work and patents related to PG is referred to as PG, as is done by the parties.

[3] Missouri Soybean has multiple subsidiary organizations that played a role in this case. For ease of discussion, we refer to Missouri Soybean and all its subsidiaries as Missouri Soybean.

3

Missouri Soybean had an option to license those inventions from the University, with 25 percent of the net revenues returning to the University and an additional 8.33 percent going directly to Suppes. Suppes established a limited liability company,[4] Renewable Alternatives ("RA"), to conduct some of his research. RA leased an office from the University but failed to lease or pay for any laboratory space from the University. Instead, all research was done in the lab provided by the University to Suppes for his work with for the University. Pursuant to an agreement between the University and RA, any inventions developed by both University employees and RA employees would be jointly owned, and RA was given first option to lease these inventions.

Suppes developed a number of inventions related to PG. He was enthusiastic about the commercial potential for these inventions, predicting it would generate millions of dollars in royalties each year from production of PG, and millions more from the production of another chemical acetol. Suppes represented to Missouri Soybean that he owned the nonprovisional rights to the PG technology and worked with Missouri Soybean to obtain a patent for the technology. On March 15, 2005, RA then entered into a licensing agreement with a Missouri Soybean subsidiary granting to it exclusive license to the PG technology. RA represented that it was the sole owner of the PG technology. In exchange for the license, the Missouri Soybean subsidiary agreed to pay RA royalties at a rate of 33 percent for two years and twenty percent thereafter. In turn, on July 15, 2005, the Missouri Soybean subsidiary entered into a sub-license agreement with Senergy Chemicals

---

[4] Establishing a company under which research would be conducted was a common practice for professors because in order to be eligible for certain federal grants, the research needed to be conducted by a small business with at least one employee, other than the faculty member.

4

("Senergy") to manufacture PG using Suppes's technology. The University was not made aware of these agreements until October 2005. The University then attempted to negotiate a three-way agreement between Suppes, the University, and Missouri Soybean that recognized the University's ownership of PG.

January 14, 2007, Suppes sent an email to the University and others stating the he would not sign any documents relating to PG until a three-way agreement was completed. Around the same time, Missouri Soybean's lawyer contacted Suppes with a final notice that he needed to sign certain documents or patent rights related to the PG technology would be lost. The deadline passed without signature resulting in the abandonment of one patent application and the loss of foreign patent protection for another.

Suppes eventually executed assignments for the PG technology in June 2007, after the University Patent Committee determined the technology had been created within the scope of Suppes's employment and belonged to the University. Suppes still, however, refused to cooperate with the University further until a licensing agreement was reached with Missouri Soybean. The University and Missouri Soybean finalized an agreement regarding PG in September 2007.

In March 2008, Senergy signed a memorandum of understanding with SK Chemical, a South Korean company, for the manufacture of PG. However, once SK Chemical discovered that one of the patent applications for the PG had been abandoned in 2007, SK Chemical decided not to enter into a contract with Senergy. Senergy never produced PG on a commercial scale.

5

The University brought suit against Suppes in April 2009. Three claims were tried and submitted to the jury: breach of contract, tortious interference, and breach of the duty of loyalty. The University also sought equitable relief, but these claims were decided by the court following trial. The jury returned verdicts for the University on the breach of contract and breach of loyalty claims, awarding $300,000 on each claim. It found for Suppes on the tortious interference claim. After trial, the court found for the University on its equitable claims, ordering Suppes to execute an assignment to the University for any inventions related to the PG technology. The court entered final judgment on October 12, 2017 ("Judgment").

This appeal followed.

**Discussion**

**I.**

Suppes's first point on appeal alleges that the circuit court erred in ordering him to assign U.S. Patent No. 6,574,971 ("'971 Patent") to the University because such relief was not requested in the Petition. Suppes also raises in his Point Relied On that the Assignment includes patent application No. 09/945, 682 ("'682 Application") which the trial court had previously dismissed allegations regarding this patent from the proceedings.

"The circuit court is vested with considerable discretion in ruling on a motion to amend judgment, and the court of appeals will not reverse a circuit court's decision on a motion to amend judgment unless there is an abuse of discretion." *Gill Constr., Inc. v. 18th & Vine Auth.*, 157 S.W.3d 699, 711-12 (Mo. App. W.D. 2004).

The relevant portion of the Judgment orders Suppes to:

6

Execute the Assignment, Page 1 and Page 2 of which shall be unaltered and unmodified, which was attached to the letter from Plaintiff's University's attorney to Galen J. Suppes, dated November 10, 2008, which was admitted into evidence as part of Plaintiff's Exhibit No. 351a, assigning to Plaintiff University all right, title and interest in the inventions related to the glycerol to propylene glycol technologies contained on Exhibit A of Plaintiff's Exhibit No. 351a. Plaintiff's Exhibit 351a is attached hereto as Exhibit 1 and incorporated herein by reference.

The University concedes that the intent of the Judgment was for Suppes to only assign "all right, title and interest in the inventions *related to the glycerol to propylene glycol technologies contained on Exhibit A*" attached to the Assignment. (emphasis added). The University argues that Suppes's first point on appeal is without merit because, the '971 Patent applied to "phase change materials" and not to the "glycerol to propylene glycol technologies," therefore the Judgment by its terms did not require the assignment of the technology in the '971 Patent. At oral argument, the University contended that the language of the Judgment expressly barring alteration of pages one and two of the Assignment implicitly then allows alternation of Exhibit A which is on pages three and four of the Assignment. Thus, it is the position of the University that Suppes is free to exclude the '971 Patent and '682 Application from the list of items being assigned pursuant to Exhibit A prior to execution of the Assignment.

We accept the University's interpretation and thus affirm the Judgment as to the allegations of error raised by Suppes in Point Relied on I with the express understanding that Patent No. 6,574,971 and Patent Application No. 09/945,682 will be deleted from the list of items being assigned pursuant to Exhibit A. As required by the Judgment, at the

7

time the Assignment is executed, Exhibit A should properly reflect the assignment of all "the inventions related to the glycerol to propylene glycol technologies."

In light of the above position of the University, we deny Point Relied on I.

**II.**

Suppes's second point on appeal alleges that the circuit court erred in denying Suppes's Motion for a New Trial because the Judgment erroneously assessed certain costs to Suppes.

"Awarding costs and expenses is within the sound discretion of the trial court and should not be reversed absent a showing that the trial court abused its discretion." *Trimble v. Pracna*, 167 S.W.3d 706, 716 (Mo. banc 2005). A trial court abuses its discretion to award costs when the judgment "was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Sasnett v. Jons*, 400 S.W.3d 429, 441 (Mo. App. W.D. 2013) (quoting *Russell v. Russell*, 210 S.W.3d 191, 199 (Mo. banc 2007)). "If a judgment awards costs or expressly refuses to award costs in a manner that is inconsistent with the law, it is axiomatic that the trial court has abused its discretion." *Riggs v. State Dep't of Social Servs.*, 473 S.W.3d 177, 182 (Mo. App. W.D. 2015).

There are two separate and distinct considerations when it comes to costs. Whether the award was proper and whether the calculation and taxation of costs was erroneous. *Id.* at 184. A party may appeal the award of costs following the judgment of the circuit court. *Id.* at 183-84. A party may not, however, challenge the itemized list of costs until the circuit court clerk taxes statutory court costs. *Id.* at 185. "[A] party's bill of costs 'is merely an unsolicited gratuitous proposal.'" *Id.* (quoting *Montoya v. A-1 Mufflers, Inc.*, 331

8

S.W.3d 702, 704 (Mo. App. W.D. 2011)). As explained by *Riggs*, "section 514.260 imposes the mandatory duty on the circuit clerk, not the trial court, to tax statutory court costs." *Id.* A "memorandum of costs present[s] nothing for the trial court to decide because the circuit clerk ha[s] not yet issued a bill of costs. Until the circuit clerk taxes costs in [a] case, no party is in a position to file a Rule 77.05 motion asking the trial court to retax costs." *Id.*

The Judgment contains no itemized bill of costs. The itemized costs of which Suppes now complains are contained in the University's "Bill of Costs" that were submitted to the circuit court following its Judgment. Just as with *Riggs* and *Montoya*, the costs requested by the University are not appealable until they are taxed by the circuit clerk. The only issue ripe for appeal at this time is whether the circuit court abused its discretion in imposing all costs on Suppes.

Section 514.060[5] states: "In all civil actions, or proceedings of any kind, the party prevailing shall recover his costs against the other party, except in those cases in which a different provision is made by law." As noted by this Court in *Riggs*, "[s]ection 514.060 does not dictate an 'all or nothing' approach to the recovery of costs. . . ." *Riggs*, 473 S.W.3d at 183. "The Legislature's intent was 'to provide for judicial discretion in the apportionment of costs, both when substantial issues are found against a party, as well as when he fails on a cause of action pleaded by him.'" *Id.* (quoting *Schumacher v. Mehlberg*, 70 S.W. 910, 911 (Mo. 1902)). Additionally, section 514.090 specifically states: "Where

---

[5] All statutory citations are to RSMo 2016 as currently updated, unless otherwise noted.

there are several counts in any petition, and any one of them be adjudged insufficient, or a verdict, or any issue joined thereon, shall be found for the defendant, costs shall be awarded at the discretion of the court."

In this case, the University prevailed on the majority of its claims against Suppes but the jury found in favor of Suppes on the University's claim for tortious interference. Although the University did not prevail on its claim for tortious interference, it was successful in proving that Suppes had breached not only his employment contract but violated his duty of loyalty to the University resulting in financial loss to the University and a protracted legal battle. Suppes points to no case law that limits the discretion of the circuit court to award costs solely against one party even if that party was not successful in all claims. Instead, under Missouri law either party may be ordered to pay costs or they may be apportioned among the parties. *See In re Estate of DePew*, 511 S.W.3d 420, 430 (Mo. App. S.D. 2017). Suppes presents no credible argument for how the trial court abused its discretion in ordering Suppes to pay all costs of the underlying action.

We disagree with Suppes's assertion that section 514.090 also sets up the ripeness for appeal of the taxation of costs. It merely establishes the circuit court has discretion in how to award costs. It does not allow this Court to review a claim that has not yet been finally determined. The question of whether each specific cost set forth in the itemized bill of costs as requested by the University is proper is not ripe for appeal. As this Court fully discussed in *Riggs* and *Montoya*, until the circuit clerk taxes costs, there is nothing to appeal.

To the extent Suppes's second point on appeal challenges the award of costs against Suppes, we find that the circuit court did not abuse its discretion ordering him to pay all of the costs. All other claims raised by Suppes regarding the taxation of any one specific cost is premature and not ripe for appeal, thus they are dismissed.

**III.**

Suppes's third point on appeal alleges that the trial court erred in submitting the University's claim of tortious interference with a business relationship to the jury because the instruction did not properly reflect the state of Missouri law. Specifically, Suppes argues that, under Missouri law, a claim for tortious interference requires a breach or a termination of a business relationship. Suppes argues the elements of this cause of action are laid out by MAI 23.11[6] and failure to follow the approved jury instruction constituted reversible error. However, in order to demonstrate prejudice, Suppes challenges not the error in the jury instruction submitted for this claim but rather that the claim should not have been submitted to the jury in the first place, a distinct and separate allegation of error.[7]

"When reviewing claims of instructional error, we will reverse a jury verdict on the ground of instructional error if the error resulted in prejudice that 'materially affected the merits of the action.'" *Savage v. Kansas City Power & Light Co.*, 515 S.W.3d 778, 783 (Mo. App. W.D. 2017) (quoting *Coomer v. Kansas City Royals Baseball Corp.*, 437

---

[6] All references are to Missouri Approved Jury Instruction as currently updated.

[7] The University contends that Suppes's third point on appeal is multifarious and, as such, preserves nothing for appeal. *See Ivie v. Smith*, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014); Rule 84.04. Violation of Rule 84.04 is sufficient grounds for dismissing an appeal. *Robin Farms, Inc. v. Bartholome*, 989 S.W.2d 238, 245 (Mo. App. W.D. 1999). In fact, the University correctly notes that all of Suppes's remaining points on appeal are multifarious and, as such, preserve nothing for appeal. However, because we prefer to decide cases on the merits where appellant's argument is readily understandable, we have elected to exercise our discretion to review the merits of the arguments set forth in the point relied on to the extent discernable.

11

S.W.3d 184, 191 (Mo. banc 2014)). As the University notes, Suppes was successful on the claim of tortious interference and thus there is no prejudice because no damages were awarded on this claim. *See generally, Benedict v. N. Pipeline Constr.*, 44 S.W.3d 410, 428 (Mo. App. W.D. 2001).

Suppes attempts to circumvent this well-established legal principle by arguing he was prejudiced because based on the submission of this claim the University was allowed to present evidence of its request for 3.7 million dollars in damages for the tortious interference claim and this improperly prejudiced the jury against him in the calculation of damages for his other claims. Suppes's argument is incorrect. The evidence regarding the 3.7 million dollar calculation of damages was presented by the University in regard to all of its claims, regardless of the submission of the tortious interference claim. The evidence was testified to by the University's expert Adam Falconer ("Falconer"), a patent valuation expert, who presented his calculation of damages to the jury during the University's case. The jury heard his opinion regarding the calculation of damages as to all claims and it was not limited to the tortious interference claim. Falconer's testimony supported damages for all claims raised. Suppes argues that had the tortious interference claim not been submitted, he would have been able to argue in his closing argument that the damages testimony was irrelevant. This is not correct, the testimony still would have been relevant as to the other claims brought by the University.

Additionally, Suppes's argument on this point is circular. He does not argue that there was insufficient evidence to submit this claim to the jury, only that the way it was submitted to the jury was not proper. He then attempts to bootstrap an argument that

12

because it was not properly instructed that it never should have been submitted and therefore the jury would have never heard the evidence as to the damages regarding this count. While we disagree with Suppes's argument that the instruction on this claim was improper, the relief he would be entitled to had this claim been improperly instructed would have been a retrial on this claim not an order that the claim could not be submitted to the jury.

Assuming arguendo that Suppes intended to challenge the submission of this claim as well, the only substantive argument raised as to the submissibility of the tortious interference claim comes in Suppes's reply brief. In his reply brief, Suppes argues that the claim was improper because there was no evidence that the University had a business relationship with either Senergy or SK Chemicals, or that the University's relationship with Missouri Soybean ended or was diminished as a result of the failed PG venture. This argument misconstrues the jury instructions. Jury Instruction No. 12 states that Suppes's actions interfered with the University and Missouri Soybean's plans to commercialize PG with Senergy. There was sufficient evidence presented at trial that the University licensed PG to Missouri Soybean who, in turn, leased the rights to Senergy. There was clearly a business relationship between the University and Senergy through Missouri Soybean. There was also sufficient evidence that Suppes failed to sign documents necessary to implement or maintain the patent for the PG technologies. Also, the jury heard testimony from Senergy that he contacted competitors of Senergy regarding proprietary information. Suppes presents no argument challenging the University's connection to Suppes's alleged tortious behavior.

13

Further, as noted above, even if the court erred in submitting the claim for tortious interference to the jury, there was no prejudice because Suppes was ultimately successful in his claim. To the extent the allegation of prejudice rests on the jury hearing a damages claim for 3.7 million dollars, that testimony was already properly before the jury. As noted above, there is no basis for Suppes's argument that, absent submission of the tortious interference claim he would have been able to argue that Falconer's testimony regarding these damages was irrelevant to the remaining claims. *See Trimble*, 167 S.W.3d at 711 (Plaintiff could present multiple theories of recovery so long as they were not factually inconsistent, but instead merely included damages that could be overlapped.)[8]

The University proffered sufficient facts to submit a claim of tortious interference to the jury. Because Suppes sole claim of prejudice is due to the submission of tortious interference claim to the jury and not the language of Instruction No. 12, he has no valid argument that he was prejudiced. Suppes was successful on the underlying claim. To the extent the jury heard evidence of the damages regarding tortious interference, it was a request properly before the jury, regardless of the language of the instructions. Point Relied on III is denied.

## IV.

Suppes's fourth point on appeal alleges that the circuit court erred in overruling his Motion for Judgment Notwithstanding the Verdict and A New Trial, or in the Alternative

---

[8] A plaintiff is only entitled to be whole once, even on separate theories of recovery. *Trimble*, 167 S.W.3d at 711. However, Suppes raises no argument that the University recovered more than the damages it incurred.

14

for Remittitur ("Post-Judgment Motion") as to the University's breach of contract claim because the University failed to prove damages with reasonable certainty.

"The standard for reviewing a denied motion for JNOV is essentially the same as for reviewing the denial of a motion for directed verdict." *Hammett v. Atcheson*, 438 S.W.3d 452, 458 (Mo. App. W.D. 2014). "[G]ranting a motion for JNOV is a drastic action and should only be granted when reasonable persons could not differ on the correct disposition of the case." *Id.* "We are 'only obliged to determine whether there was evidence from which such verdict could have been reached by a jury composed of reasonable men and women.'" *Id.* at 459 (quoting *Envtl. Energy Partners, Inc. v. Siemens Bldg. Techs., Inc.*, 178 S.W.3d 691, 698 (Mo. App. S.D. 2005)). "We 'will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative facts to support the jury's conclusion.'" *Id.* (quoting *Peel v. Credit Acceptance Corp.*, 408 S.W.3d 191, 204 (Mo. App. W.D. 2013)).

"To recover lost profits stemming from a breach of contract, a plaintiff need only prove the fact of damages with reasonable certainty and provide an adequate basis for the jury to estimate the lost profits with reasonable certainty." *Midwest Coal, LLC ex rel. Stanton v. Cabanas*, 378 S.W.3d 367, 371 (Mo. App. E.D. 2012) (citing *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 54-55 (Mo. banc 2005)). "'[C]ertainty' means that damages have been suffered and not exact proof of the amount of the damages. Where the fact of damage is clear, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury,

15

subject to the usual supervisory power of the court." *Harvey v. Timber Ress., Inc.*, 37 S.W.3d 814, 819-20 (Mo. App. E.D. 2001) (internal citations omitted).

Suppes provides no substantive argument supporting his theory that there was inadequate proof of damages in the breach of contract claim. Instead, Suppes cites to several cases that hold, once the fact of damages has been established, courts require a lesser degree of certainty as to the amount of damages, leaving the jury to exercise a greater degree of discretion. *See Penzel Constr. Co. v. Jackson R-2 Sch. Dist.*, 544 S.W.3d 214, 236 (Mo. App. E.D. 2017); *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 196 (Mo. App. E.D. 2007). Then Suppes proceeds to argue not that there was insufficient evidence to support a claim for damages but instead argues that, even if there was sufficient evidence the circuit court should have used its discretion to exercise remittitur because the amount of damages was excessive. These are two separate arguments and we address each in turn.

## A. Evidence of Damages

The burden of proving that damages exist, and the amount of those damages, rests with the party claiming breach of contract. *Ullrich v. CADCO, Inc.*, 244 S.W.3d 772, 779 (Mo. App. E.D. 2008). "A plaintiff claiming a breach of contract has available and need not choose between three types of damages--actual, consequential, and benefit-of-the-bargain--as such damages are not necessarily inconsistent with one another; a plaintiff may not, however, be made whole more than once." *Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817 (Mo. App. S.D. 2008).

> "Actual damages are compensatory and are measured by the loss or injury sustained" as a direct result of the wrongful act. *Stiffelman v. Abrams,* 655 S.W.2d 522, 531 (Mo. banc 1983). Consequential damages "are those

16

> damages naturally and proximately caused by the commission of the breach and those damages that reasonably could have been contemplated by the defendant at the time of the parties' agreement." *Ullrich,* 244 S.W.3d at 779. Finally, benefit-of-the-bargain damages, also called lost profits damages, are the "net profits a plaintiff would have realized" had the contract not been breached. *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.,* 155 S.W.3d 50, 54 (Mo. banc 2005). There are situations in which all three types of damages could be deemed appropriate by a finder of fact, but that is not always the case. *See Davis,* 143 S.W.3d at 670.

*Catroppa*, 267 S.W.3d at 818. The jury verdicts did not distinguish the type of damages awarded, nor did the parties request that such a distinction be made. Thus, we accept the damages award if there is substantial evidence in the record supporting any of the three types of allowable damages. *See Id.*

At trial, the University proved damages through the general testimony of University personnel who spent countless hours trying to unravel the questions surrounding ownership of the PG technology. Additionally, the University relied on the testimony of Falconer regarding the valuation of the value of PG to the University, had there not been an issue surrounding the ownership of the technology. The University contends that because Suppes did not timely and properly assign his patents to the University, it lost a great deal of profits and revenue that would have stemmed from the licensing of that technology. "For an award of lost profits damages, a party must produce evidence that provides an adequate basis for estimating the lost profits with reasonable certainty." *Ameristar Jet Charter, Inc.*, 155 S.W.3d at 54. As noted by the Supreme Court in *Ameristar*:

> In some cases, the evidence weighed in common experience demonstrates that a substantial pecuniary loss has occurred, but at the same time it is apparent that the loss is of a character which defies exact proof. In that situation, it is reasonable to require a lesser degree of certainty as to the

17

> amount of loss, leaving a greater degree of discretion to the court or jury. This principle is applicable in the case of proof of lost profits.

*Id.* at 55 (quoting *Ranch Hand Foods, Inc. v. Polar Pak Foods, Inc.*, 690 S.W.2d 437, 444-45 (Mo. App. W.D. 1985)).  The testimony of Falconer was that there are fairly developed best practice guidelines for valuing IP technology.  Falconer used these methodologies and used the minimum production volumes estimated by the entities involved together with the specific royalty to be paid to the University had PG gone into commercial production as expected.

Suppes argues that there was no evidence showing that any lost profits resulted in or caused any damages to the University.  This ignores the clear testimony of Falconer that the University was entitled to royalties on any production of PG and provided estimates as to those amounts.

## B.  Excessive Damages

The above discussion also demonstrates that the circuit court did not err in denying Suppes's request for remittitur.  The University adduced competent evidence that it sustained damages of 3.7 million dollars.  The jury awarded substantially less than the sum requested but evidence was before the jury from which it could have awarded substantially higher damages.  Suppes appears to contend that because the evidence of damages was also used to support the University's claim of tortious interference, a claim upon which it lost, it could not also be used as evidence to support damages for breach of contract.  We disagree.  As discussed *supra* in Suppes's third point, damage calculations may be used to support multiple theories of recovery.  *See Trimble*, 167 S.W.3d at 711.  A plaintiff may

18

not recover the same damages under multiple claims; a plaintiff may only be made whole once. *Catroppa*, 267 S.W.3d at 817. But, there is no overlapping recovery here, nor has Suppes raised any such claim of error. Other than claiming insufficient evidence of damages, Suppes provides no bases for remittitur. Based on the evidence of substantial damages presented by the University, the circuit court did not abuse its discretion in denying Suppes's request for remittitur.

In his Reply Brief, Suppes appears to argue for the first time that there was insufficient evidence to support damages because "all seven (7) PG patents that issued listed [University] as assignee." Suppes appears to argue that because he may have eventually assigned the PG patents to the University there could be no damages for his breach of contract. We disagree. As noted above, the University presented sufficient competent evidence that the University suffered damages from Suppes not timely fulfilling his contractual obligations to the University because such actions hindered the commercialization of PG. The jury was not required to find that the University suffered no damages simply because after breaching his contract Suppes later assigned some PG patents.

Point IV is denied.

## V.

Suppes's fifth point on appeal alleges that the circuit court erred in overruling his Post-Judgment Motion as to the University's breach of duty of loyalty and breach of contract claims because the court allowed the submission of jury instructions nine and fifteen which improperly held Suppes liable for the actions of RA.

19

Jury Instruction No. 9 read:

Your verdict must be for plaintiff if you believe:

First, defendant used Renewable Alternatives ("RA") to represent to Missouri Soybean that RA held sole title, right, and interest to the propylene glycol technology to the exclusion of plaintiff and to license those rights to Missouri Soybean; and

Second, because of this representation and license, defendant's contract obligations were not performed, and

Third, plaintiff was thereby damaged.

Jury Instruction No. 12 read:

Your verdict must be for plaintiff if you believe:

First, a business relationship existed between the plaintiff and Missouri Soybean to commercialize propylene glycol with Senergy Chemical Corporation ("Senergy"); and

Second, defendant was aware of the relationship between plaintiff and Missouri Soybean to commercialize propylene glycol with Senergy, and

Third, defendant interfered with the business relationship between plaintiff and Missouri Soybean to commercialize propylene glycol by refusing to sign a document needed to prevent abandonment of a patent application, or by talking to competitors of Senergy about proprietary intellectual property, and,

Fourth, defendant did so intentionally and without justification or excuse, and

Fifth, plaintiff was thereby damaged.

Suppes alleges that in order to hold him liable for "using" RA to act, the University was required to "pierce the corporate veil." Piercing the corporate veil is used "[w]here a corporation [or an LLC] is used for an improper purpose and to perpetuate injustice by which it avoids its legal obligations, equity will step in, pierce the corporate veil and grant

20

appropriate relief." *Hammett*, 438 S.W.3d at 461. The only time that it is necessary to pierce the corporate veil is to hold an otherwise unrelated actor liable for the actions of another. In this case, the University brought their claim directly against Suppes for Suppes's actions in violation of his own employment contract and in violation of his own duty of loyalty. There was no need to pierce the corporate veil because the University is not seeking to hold RA legally responsible for the actions of Suppes or requesting that RA be charged with payment of any of the damages. Instead, Suppes was the responsible party, the party contracting with and owing a duty to the University and the party against whom the University was seeking recovery of damages. The University made a direct claim against Suppes and is seeking to recover damages from Suppes.

We decline to address Suppes's allegation in his argument under this point that the University failed to present sufficient evidence of damages to support either claim because that claim of error was not properly raised in this point relied on. *Holliday Invs., Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 297 n.5 (Mo. App. W.D. 2015) ("Claims of error raised in the argument portion of a brief that are not raised in the point relied on are not preserved for our review.") Additionally, such allegations are adequately addressed in Suppes's other points on appeal.

We find the allegations raised by Suppes in his Point Relied on V to be without merit. Point Relied on V is denied.

21

**VI.**

Suppes's sixth point on appeal alleges that the circuit court erred in denying Suppes's Post-Judgment Motion as to the University's breach of loyalty claim because the University failed to make a submissible case that Suppes was the alter ego of RA.

This argument suffers from the same deficiency as Suppes's argument regarding his fifth point on appeal. The University brought a claim directly against Suppes for his breach of his duty of loyalty to the University. The University was not required to show that Suppes was the alter ego of RA to make a submissible claim. Under Missouri law, alter ego liability is a "separate and distinct cause of action" that allows a court to hold a business entity's owners personally liable for the entity's obligations. *Saidawi v. Giovanni's Little Place, Inc.*, 987 S.W.2d 501, 504 (Mo. App. E.D. 1999). The University did not raise a claim of alter ego liability; nor did the University seek to hold Suppes liable for RA's obligations or RA liable for Suppes's obligations. The University brought a breach of loyalty claim directly against Suppes for Suppes's own actions, and sought damages against Suppes. Thus, the circuit court did not err in overruling Suppes's Post-Judgment Motion for the reasons raised in Point Relied on VI. Point Relied on VI denied.

**VII.**

Suppes's seventh point on appeal alleges that the circuit court erred in overruling Suppes's Post-Judgment Motion by allowing the submission of jury Instruction No. 9 because it required the jury to "determine that [Suppes] breached a contractual obligation to [the University] based on an agreement between two legal entities who were not or were no longer parties to the lawsuit and there was a complete lack of probative evidence that

22

these parties had any contractual obligation to [the University] that could have been breached by [Suppes]."

As noted above in Point Relied on V, the language of the instruction only refers to the actions of Suppes violating his duty to the University. It asks the jury to determine whether Suppes used RA to exclude the University from exercising its interests in PG. It is immaterial that RA was not a party to the suit. So too is it irrelevant as to whether RA or Missouri Soybean had a contractual obligation to the University. The jury instruction directly addresses whether Suppes breached his contractual obligations to the University and whether the University thereby suffered damages.

To the extent that Suppes seeks to argue that there was insufficient evidence to show that Suppes breached his contractual duties to the University, this claim is without merit. The University presented evidence that Suppes was employed by the University and, as a condition of his employment, had agreed to notify the University as to all his inventions and assign them upon request. The University presented evidence that Suppes instead assigned the PG technology to RA in breach of Suppes's contractual obligations to the University. As stated in Instruction No. 9, Suppes used RA to represent to Missouri Soybean that RA held the sole interests to the PG technology which was a breach of Suppes's contract with the University.

"The trial court has discretion when determining whether jury instructions are confusing or misleading." *Portis v. Greenhaw*, 38 S.W.3d 436, 445 (Mo. App. W.D. 2001). The trial court's ruling on such an objection will not be disturbed absent a showing that the court abused its discretion. *Id.* We find that the circuit court did not abuse its discretion

23

in finding that Instruction No. 9 was clear and was supported by sufficient evidence of the claims presented to the jury.

We find Suppes's alleged challenges to the jury instruction misread its plain terms and thus such challenges are without merit.

Suppes's seventh point on appeal is denied.

## VIII.

Suppes's eighth point again challenges jury Instruction No. 9 and Instruction No. 15. Suppes alleges that the circuit court erred in overruling his Post-Judgment Motion because "it sought to impose tort liability based on a contractual obligation, which was misleading and confusing to the jury in that both Instructions No. 9 and 15 were predicated on the license agreement between RA and Missouri Soybean, neither a party to the lawsuit, which permitted the jury to make double awards for the same damages."

It appears that Suppes seeks to raise three distinct issues in this point on appeal. First, Suppes alleges that the claims should not have been submitted to the jury because RA and Missouri Soybean were not parties to the suit. This issue was addressed fully in the proceeding points not to be repeated here and is without merit.

Second, the Point Relied On argues that the court erred in its instructions to the jury because Instruction No. 9 and Instruction No. 15 were confusing. This issue was fully addressed above as to Instruction No. 9. The same discussion is applicable to Instruction No. 15. Suppes fundamentally misunderstands Instruction No. 15. Instruction No. 15 holds Suppes liable for breaching his duty of loyalty to the University. It does not, as Suppes seems to suggest, hold RA or Missouri Soybean liable. Nor does it otherwise

24

matter that RA and Missouri Soybean were not parties to the cause of action. The trial court did not abuse its discretion in finding that Instruction No. 15 was not confusing or misleading to the jury. *Portis*, 38 S.W.3d at 446.

Finally, Point Relied on VIII alleges that Instruction No. 9 and Instruction No. 15 allowed for the duplication of damages because they present inconsistent theories of recovery. As the University accurately points out, this issue was not preserved for appeal as this objection was never raised before the trial court. However, even if it were preserved, the circuit court did not err in its instructions because no inconsistent theories of recovery were permitted. Instruction No. 9 instructs regarding Suppes's breach of his contract with the University; Instruction No. 15 instructs regarding to Suppes's breach of his duty of loyalty to the University. A single transaction may give rise to two separate wrongs such that there are "distinct claims that may be pursued to satisfaction consecutively." *Trimble*, 167 S.W.3d at 711.

Suppes appears to argue that his breach of his duty of loyalty was not a separate wrong from his breach of contract. In Missouri, an employee owes a duty of loyalty to his employer that "[h]e must not, while employed, act contrary to the employer's interests and, in general terms, owes a duty of loyalty as one of the incidents of the employer-employee relationship." *Nat'l Rejectors, Inc. v. Trieman*, 409 S.W.2d 1, 41 (Mo. banc 1966); *Scanwell Freight Express STL, Inc. v. Chan*, 162 S.W.3d 477, 479 (Mo. banc 2005). This duty is separate and distinct from the employment contract that Suppes had with the University. Under Instruction No. 9, the jury was asked to decide whether Suppes had violated the terms of his employment contract, which required the assignment of all

25

inventions, by using RA to misrepresent to Missouri Soybean that RA and not the University owned the rights to PG. This was a breach of his employment contract. Separate and distinct, Instruction No. 15 asked the jury to consider whether Suppes had breached the general duty of loyalty that an employee owes to an employer by acting in direct competition with the University to attempt to profit from and produce PG to the detriment of the University. They were two separate wrongs performed by Suppes and the circuit court did not err in allowing the University to recover damages for each wrong. As Suppes himself notes: "[t]heories are inconsistent and require an election only if, in all circumstances, one theory factually disproves the other." *Trimble*, 167 S.W.3d at 711. Instruction No. 9 and Instruction No. 15 do not disprove each other.

Suppes's eighth point on appeal is denied.

## IX.

Suppes's ninth and final point on appeal alleges that the circuit court erred in denying Suppes's Post-Judgment Motion because the Judgment included redundant judgments. This issue was not preserved for appeal so it can only be reviewed for plain error. "We only will review a claim for plain error if it 'facially establishes substantial grounds for believing that a 'manifest injustice or a miscarriage of justice' would result if left uncorrected.'" *Coats v. Hickman*, 11 S.W.3d 798, 805 (Mo. App. W.D. 1999) (quoting *Brown v. Mercantile Bank*, 820 S.W.2d 327, 335 (Mo. App. S.D. 1991)). "As a practical matter, we rarely resort to plain error review in civil cases." *Id.*

Although it is not clear from his Opening Brief, in his Reply Brief, Suppes identifies that his claim regarding redundant damages stems from jury Instruction No. 7 and

26

Instruction No. 8. These instructions both apply to the same breach of contract claim. The jury was allowed to consider multiple ways in which Suppes violated his contract with the University in determining damages. Jury Instruction No. 10 directed the jury to: "award [the University] such sum as you believe will fairly and justly compensate [the University] for any damages you believe [the University] sustained as a direct result of the conduct of defendant as summited Instructions Numbers 7, 8, or 9." To the extent that Suppes is relying on a "single source of damages" argument as to the claim for breach of contract it is immaterial because the jury was instructed to determine one amount of damages for the entire breach of contract claim. The Reply Brief goes on to clarify that the argument is that there is a "complete absence of evidence justifying the jury award of $300,000" in damages which was fully addressed in the points relied on above.

Suppes's ninth point on appeal is without merit and is denied.

### Conclusion

For the reasons stated above, we affirm the Judgment.

_____
Gary D. Witt, Judge

All concur

27